[Cite as *In re Adoption of B.A.H.*, 2012-Ohio-4441.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
GREENE COUNTY

IN THE ADOPTION OF:        :

       :      Appellate Case No.   2012-CA-44

     B.A.H.        :

       :      Trial Court No. 10167AD-12-11

       :

       :      (Civil Appeal from Common Pleas

       :       Court, Probate)

       :

. . . . . . . . . . .

O P I N I O N

Rendered on the 28th day of September, 2012.

. . . . . . . . . . .

HARRY G. BEYOGLIDES,JR., Atty. Reg. #0018959, 130 West Second Street, Suite 1900, Dayton, Ohio 45402
      Attorney for Appellant

MICHAEL R. VOORHEES, Atty. Reg. #0039293, Voorhees & Levy LLC, 11159 Kenwood Road, Cincinnati, Ohio 45242
      Attorney for Appellee

. . . . . . . . . . . .

FAIN, J.

{¶ 1} Appellant B.N. appeals from an order of the Greene County Common Pleas Court, Probate Division, finding that his consent is not necessary with regard to the adoption

of his minor child. B.N. contends that the trial court's order is against the manifest weight of the evidence.

{¶ 2}    We conclude that the record does not demonstrate by clear and convincing evidence that B.N. willfully abandoned the birth mother during her pregnancy and up to the time of her surrender of the baby, or that he willfully abandoned or failed to care for and support the baby. Therefore, we conclude that the probate court erred in its determination that B.N.'s consent was not required for adoption.

## I. The Facts in Evidence

{¶ 3}    A.W. was a minor, aged fifteen, when she became pregnant in 2011. She did not inform her parents or the putative father, B.N., of the pregnancy until August. B.N. had just turned eighteen years old at the time the pregnancy was discovered. On October 3, 2011, A.W.'s parents sent her to live at Harbor House Maternity Home ("Harbor House"). The child was born on December 1, 2011. A.W. and the child remained at Harbor House until January 17, 2012, at which time A.W. executed a permanent surrender form giving the child to an adoption agency, which then placed the child with appellees, S.H. and B.H.

{¶ 4}    A.W. testified that she told B.N. that she was pregnant on August 3, 2011, and that she told her parents a few weeks later. She testified that she and B.N. wanted to raise the child. She testified that B.N. and his parents offered to let her live in their family residence. She further testified that B.N. took her out at least twice a week prior to her move to Harbor House. She testified that both B.N. and his parents offered to pay for her doctor visits during this time, but that A.W.'s mother refused the offer. A.W. testified that her parents told her

she would no longer be able to see B.N. She testified that she had one doctor's visit prior to moving to Harbor House and that B.N. could not attend because he was attending high school during that time and her parents did not want him to go. She testified that B.N. provided her with maternity and baby clothes prior to leaving for Harbor House.

{¶ 5} A.W. testified that on October 3, 2011, her parents moved her to Harbor House, which is approximately two and one-half hours away from her home. A.W. further testified that B.N. did visit with her at least once while she was at Harbor House, and that he tried to visit her more often, but the Harbor House staff cancelled some of his scheduled visits. She also testified that B.N. did come visit the baby following the birth. A.W. testified that when she was moved to Harbor House she was given the impression that staff prevented B.N. from visiting her because he did not want to put the baby up for adoption. She further testified that, at first, she contacted B.N. via her cellular telephone, but the Harbor House staff found out and confiscated her cell phone. Finally, A.W. testified that she received personal gifts, baby clothes, diapers, wipes and a toy from B.N. while at Harbor House.

{¶ 6} A.W.'s mother testified that she found out that her daughter was pregnant at the end of August 2011. She testified that she spoke with B.N.'s parents and learned that they did not want to place the baby for adoption. She testified that B.N. and his parents offered to let A.W. reside with them, but she did not feel it was "moral" and refused the offer. She further testified that she had over $500 in expenses associated with the birth and she requested financial help from B.N.'s parents. She testified that the parents did not provide any financial assistance, but she also testified that she never presented any bills to them for payment. While she did testify that there was a $3,000 bill for Harbor House, she further testified that

the cost would be covered by the adoptive parents following the adoption. A.W.'s mother further testified that she never spoke to B.N. about any financial issues and never presented him with any bills. She testified that she failed to do so because B.N.'s mother had refused to provide financial help.

{¶ 7} B.N. testified that he attended a birthing class with A.W. prior to her move to Harbor House. He also testified that she asked him to go to her doctor's appointment with her. He testified that it was originally set for after school, but he received a text message from A.W. while he was in school that she and her mom had gone during the school day. He testified that he did not have a job at the time, because he was in high school. He testified that after the birth of the child he was completing his senior year of high school through an on-line program and he had a job at a local restaurant. He testified that prior to the move to Harbor House, he took A.W. out to dinner or had her to dinner at his parents' home, where he resided, four to five times a week. B.N. testified that he was never asked to pay for any expenses.

{¶ 8} B.N. testified that he visited Harbor House during the pregnancy. He testified that one visit was solely with the facility staff. He testified that A.W. had been in contact with him until Harbor House staff confiscated her cell phone, after which he was unable to ask A.W. whether she was in need of any assistance. He testified that he had one visit with A.W. and thereafter contacted the staff regarding setting up another visit, but was told that the staff "didn't think it was necessary because she knew – they both knew where I stood with the adoption * * * that I didn't want it."

{¶ 9} B.N. testified that he was unable to visit with A.W. again, but was able to visit

the baby twice following the birth. He testified that he was notified of the birth, by e-mail from Harbor House staff, almost two weeks after the birth. He testified that he registered on the putative father registry immediately. B.N. testified that prior to his visits with the baby he asked Harbor House staff what he could provide and was told to bring diapers. He testified that on his first visit with the baby he brought diapers, wipes, an outfit, a pacifier and a toy. He testified that on the second visit he brought the baby a shirt and a rattle. He testified that he was not permitted to visit the baby after he refused to sign the consent to adopt.

{¶ 10} B.N.'s mother, N.N., testified that after learning of the birth she and her family offered to have A.W. reside with them in their home. She testified that they had a separate bedroom solely for A.W.'s use, but the offer was rejected. She testified that B.N. procured a crib, stroller, baby clothes and some maternity items for A.W.'s use. She testified that B.N. provided dinners for A.W. and he attended a childbirth class with her. N.N. testified that her son asked Harbor House what he needed to provide for A.W. and was informed that she had been given everything that was necessary. N.N. testified that after the birth, B.N. asked the Harbor House staff what he needed to provide for the baby and was told only to bring some diapers. She also testified that B.N. visited with A.W. both prior to the birth and then visited with the baby. She further testified that she and A.W.'s mother talked about the pregnancy expenses, but the mother "did not know what they were at the time and [she told me] that we would talk about it later." N.N. testified that she and A.W.'s mother never had another conversation about expenses and to the best of her knowledge, no bills were ever presented to B.N.

{¶ 11} K.E., a staff member at Harbor House, testified that the facility is a "Christian

maternity home for unwed pregnant teenage girls." She testified that A.W. entered the facility in October, delivered the baby in December and returned home approximately one month later. K.E. testified that she met with B.N. and his parents to discuss "their intentions" and to get to know the family. She testified that B.N. came to Harbor House for three "birth father" counseling sessions. She testified that she informed him of the birth by e-mail and B.N. visited with the baby twice. She testified that he did bring diapers, clothes, a toy and a pacifier during the visits.

{¶ 12} K.E. testified that she talked with B.N. and his parents about the financial aspects of raising a baby and the costs associated with that. She testified that she "indirectly" informed them of the costs associated with Harbor House, but never asked them to cover any of the expenses. She also testified that she told them Harbor House was providing the baby with formula through the "WIC program" and that neither A.W. nor B.N. would be expected to pay for that cost.

## II. The Course of Proceedings

{¶ 13} S.H. and B.H. filed a petition for adoption with the Greene County Probate Court. The petition alleged that B.N.'s consent, as the putative father, was not required because he had failed to support the child and had abandoned A.W. during her pregnancy and up to the time of her surrender of the child.

{¶ 14} Following the hearing, the probate court made the following findings of fact:

1. [B.N.] did file the "Putative Father Registry Application" timely.

2. The child was born on December 1, 2011, the permanent surrender was

signed on January 17, 2012, and the child was placed with the petitioners on that date.

3. [The mothers of the two parents] discussed medical expenses and support as early as September, 2011. [ A.W.'s] parents were committed to paying medical expenses and support for [A.W.] and her unborn child. [B.N.'s] parents did not commit to same, and paid nothing. [B.N.] provided some used maternity clothes, a few fast food meals, and one shirt for [A.W.] during her pregnancy and up to the time she surrendered the child. [B.N.] provided no financial support to [A.W.] during this period.

4. [B.N.] provided no financial support for the child from the date of his conception through the present time. He did provide a few clothes, a pack of drapers [sic] and a package of baby wipes.

5. [B.N.] was employed for a majority of the term of [A.W.'s] pregnancy and the time before the child was placed with [S.H. and B.H.]. None of his income was given to [A.W.] or the caregivers of [the baby].

{¶ 15} The probate court went on to make the following conclusions of law:

1. [B.N.'s] responsibility to provide support for [A.W.] during her pregnancy and up to the time of her signing the permanent surrender is a statutory obligation under R.C. 3107.07(B)(2)(c).

2. [B.N.'s] responsibility to provide support for his minor child which begins in utero and continues to this day is a statutory obligation under R.C. 3107.07(B)(2)(b).

3. By clear and convincing evidence the court finds that [B.N.]

willfully abandoned the birth mother during her pregnancy and up to the time of her signing the permanent surrender of her child, and he failed to provide support for his minor child, which begins in utero and continues to this day.

4.   Therefore, the consent of [B.N.] is not required in this case.

{¶ 16}   From the order determining that his consent is not required in order to proceed with the adoption of the minor child, B.N. appeals.

### III.   The Adopting Parents Failed to Prove, by Clear and Convincing Evidence, that the Putative Father Abandoned the Mother During the Pregnancy or that He Abandoned, or Failed to Support, the Child

{¶ 17}   The putative father's sole assignment of error states as follows:

THE TRIAL COURT ERRED IN CONCLUDING THAT THERE WAS CLEAR AND CONVINCING EVIDENCE THAT THE CONSENT OF [B.N.] IS NOT REQUIRED UNDER R.C. § 3107.07(B).

{¶ 18}   B.N. contends that the evidence does not support a finding that he willfully abandoned A.W. during her pregnancy or that he abandoned or failed to support his minor child.

{¶ 19}   "A parent has a fundamental right to care for and have custody of his or her child." *In re K. C.,* 2d Dist. Montgomery No. 22243, 2008-Ohio-2593, ¶ 10.   Those rights are terminated when a child is adopted.   Thus, in Ohio, putative fathers must consent to any adoption unless one of the exceptions set forth in R.C. 3107.07 applies.   That statute provides, in pertinent part, as follow:

Consent to adoption is not required of any of the following:

\* \* \*

(B) The putative father of a minor if either of the following applies:

(1) The putative father fails to register as the minor's putative father with the putative father registry established under section 3107.062 of the Revised Code not later than thirty days after the minor's birth;

(2) The court finds, after proper service of notice and hearing, that any of the following are the case:

(a) The putative father is not the father of the minor;

(b) The putative father has willfully abandoned or failed to care for and support the minor;

(c) The putative father has willfully abandoned the mother of the minor during her pregnancy and up to the time of her surrender of the minor, or the minor's placement in the home of the petitioner, whichever occurs first.

{¶ 20}   "Any exception to the requirement of parental consent [to adoption] must be strictly construed so as to protect the right of natural parents to raise and nurture their children." *In re Schoeppner*, 46 Ohio St.2d 21, 24, 345 N.E.2d 608 (1976).   Thus, in order to determine that B.N.'s consent is not required, S.H. and B.H. must demonstrate by clear and convincing evidence the existence of the exception to the consent requirement.   *In re Adoption of Hart*, 62 Ohio App.3d 544, 552, 577 N.E.2d 77 (6th Dist.1989).   Clear and convincing evidence requires a level of proof that produces a firm belief as to the facts sought to be established.   *In re A. U.,* 2d Dist. Montgomery Nos. 20583, 20585, 2004–Ohio–6219, ¶

17.

**{¶ 21}** Whether S.H. and B.H. have met this burden is a determination for the probate court that will not be disturbed on appeal unless the decision is against the manifest weight of the evidence. *Id.* Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed as being against the manifest weight of the evidence. *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 281, 376 N.E.2d 578 (1978). The weight to be given the evidence and the credibility of the witnesses are primarily for the trier of fact. *State v. DeHass*, 10 Ohio St.2d 230, 12, 227 N.E.2d 212 (1967), paragraph one of the syllabus. "In determining whether a judgment is against the manifest weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact 'clearly lost its way and created such a manifest miscarriage of justice' that there must be a reversal of the judgment and an order for a new trial." *Steagall v. Crossman,* 2d Dist. Montgomery No. 20306, 2004-Ohio-4691, ¶ 29.

**{¶ 22}** The issue is whether there is clear and convincing evidence in this record that B.N. willfully abandoned A.W. or the baby, or failed to care for or support the child. We begin with the question of willful abandonment. R.C. 3107.07 does not define the term "willfully." "Willful" is defined as "proceeding from a conscious motion of the will; voluntary. Intending the result which actually comes to pass; designed; intentional; not accidental or involuntary." *Black's Law Dictionary* 824 (Abridged Fifth Ed. 1983).

**{¶ 23}** During the two months between learning of the pregnancy and A.W.'s move to Harbor House, B.N. attempted to have A.W. move into his parent's home. He also

provided meals for A.W. several times per week. He attended a child-birth class and attempted to attend a doctor visit. He also procured numerous maternity and baby items during this time. Contrary to the finding of the probate court, B.N. was not employed during the majority of the pregnancy. Instead, he became employed after the child's birth, when he switched to an on-line program for the completion of his senior year of high school.

{¶ 24} The evidence demonstrates that during the approximately two and one-half months following A.W.'s move to Harbor House, B.N. attended several sessions with the staff and visited once with A.W. The evidence also establishes that he attempted to initiate more visits, but was either rebuffed by Harbor House staff or had his scheduled visits cancelled. Once he was informed of the child's birth, B.N. initiated two visits with the baby prior to the surrender. At no time did B.N. agree to the adoption.

{¶ 25} Based upon this record it is clear that B.N. did not willfully abandon either A.W. or his child. To the contrary, it is clear that he attempted to remain in contact with both A.W. and his child, and any limitation in his contact was the result of actions of A.W.'s parents and the Harbor House staff. A.W. was moved to a facility over two hours from her home and B.N. Yet B.N. managed to attend counseling sessions and visitations with A.W. and the baby. And this despite the fact that not only was communication discouraged, but his ability to communicate suffered significant interference when Harbor House took away A.W.'s cell phone. The only reasonable conclusion to be drawn from the evidence in this record is that B.N. neither willfully, nor otherwise, abandoned A.W. or the baby.

{¶ 26} We next turn to the issue of whether B.N. failed to support the baby. We conclude that he did not fail in his duty. The uncontradicted evidence demonstrates that B.N.

and his family offered to let A.W. reside with them during the pregnancy. Furthermore, B.N. gathered numerous maternity items as well as items for use after the baby was born. These actions represent significant efforts by an unemployed eighteen-year-old high-school student to support the baby, especially in view of the fact that he was told by the Harbor House staff that no additional assistance was required.

{¶ 27} No one discussed actual financial costs with B.N., and no one presented him with any bills. In fact, the only evidence regarding the discussion of costs with B.N. was the testimony of K.E., and she only described a generalized discussion of the average cost of raising a child. It was never made clear on this record that Harbor House actually intended to, or in fact did, invoice A.W.'s mother for any costs incurred during her stay there. To the contrary, the evidence merely reflects that A.W.'s mother was made aware that Harbor House had incurred approximately $3,000 in costs with regard to A.W.'s stay there. Furthermore, although A.W.'s mother testified that she had incurred over $500 in medical costs prior to taking her daughter to Harbor House, she conceded that she never made B.N. aware of these costs and she never presented him with any of the actual bills.

{¶ 28} We conclude that upon this record S.H. and B.H. failed to prove, by clear and convincing evidence, that B.N. willfully abandoned either A.W. or the minor child. Nor is the evidence in the record sufficient to prove, by clear and convincing evidence, that B.N. failed to provide support for the baby. Therefore, we conclude that the probate court erred in determining that B.N.'s consent is not required for the adoption of the child.

{¶ 29} B.N.'s sole assignment of error is sustained.

## IV.  Conclusion

{¶ 30}   B.N.'s sole assignment of error having been sustained, the order of the probate court from which this appeal is taken is Reversed, and this cause is Remanded for further proceedings consistent with this opinion.

. . . . . . . . . . . . .

DONOVAN and HALL, JJ., concur.

Copies mailed to:

Harry G. Beyoglides, Jr.
Michael R. Voorhees
Hon. Robert A. Hagler