[Cite as *In re Adoption of E.T.S.*, 2016-Ohio-2656.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

IN THE MATTER OF THE ADOPTION      :
OF:  E.T.S.                                          :
                                                            :        C.A. CASE NO. 26925
                                                            :
                                                            :        T.C. NO. 15ADP57
                                                            :
                                                            :        (Civil appeal from Common Pleas
                                                            :          Court, Probate Division)
                                                            :
                                                            :

. . . . . . . . . . .

**O P I N I O N**

Rendered on the ___22nd___ day of _____April_____, 2016.

. . . . . . . . . . .

MICHAEL A. SHEETS, Atty, Reg. No. 0052043, 1331 Woodman Drive, Dayton, Ohio 45432
       Attorney for Appellant

B.S./B.W., Brevard, NC 28712
       Appellee

. . . . . . . . . . . .

DONOVAN, P.J.

{¶ 1} This matter is before the Court on the Notice of Appeal of A.S. ("Stepmother"), filed November 23, 2015. Stepmother appeals from the decision of the probate court that dismissed her petition to adopt her stepson, G.W., after finding that the consent for the adoption of G.W.'s mother, B.W. ("Mother"), was required and had not

been obtained. We note that Mother did not file a brief in response herein. We hereby affirm the judgment of the probate court.

{¶ 2} Stepmother filed her petition for adoption on June 12, 2015. The petition provides that G.W. was born in November of 2013, and that Stepmother married G.W.'s father, G.S. ("Father"), on November 27, 2013. The petition provides that, pursuant to R.C. 3107.07, the consent of Mother, is not required because Mother "has failed without justifiable cause to provide more than de minimis contact with the minor for a period of at least one year immediately preceding the filing of the adoption petition or the placement of the minor in the home of the petitioner." The petition further provides that Mother's consent is not required because she "has failed without justifiable cause to provide for the maintenance and support of the minor as required by law or judicial decree for a period of at least one year immediately preceding the filing of the adoption petition or the placement of the minor in the home of the petitioner." Also on June 12, 2015, Father filed a Consent to Adoption and Stepmother filed an Affidavit. The Affidavit provides that G.W. is the subject of a custody proceeding in North Carolina between his maternal grandmother, K.W. (Grandmother"), and Mother and Father.

{¶ 3} On June 15, 2015, a Notice of Hearing on Petition for Adoption was issued to Mother via certified mail. The Notice lists her address in Brevard, North Carolina. The Notice provides as follows:

"A FINAL DECREE OF ADOPTION, IF GRANTED, WILL RELIEVE YOU OF ALL PARENTAL RIGHTS AND RESPONSIBILITIES, INCLUDING THE RIGHT TO CONTACT THE MINOR, AND, EXCEPT WITH RESPECT TO A SPOUSE OF THE ADOPTION PETITIONER AND RELATIVES OF THAT

SPOUSE, TERMINATE ALL LEGAL RELATIONSHIPS BETWEEN THE MINOR AND YOU AND THE MINOR'S OTHER RELATIVES, SO THAT THE MINOR THEREAFTER IS A STRANGER TO YOU AND THE MINOR'S FORMER RELATIVES FOR ALL PURPOSES. IF YOU WISH TO CONTEST THE ADOPTION, YOU MUST FILE AN OBJECTION TO THE PETITION WITHIN FOURTEEN DAYS AFTER PROOF OF SERVICE OF NOTICE OF THE FILING OF THE PETITION AND OF THE TIME AND PLACE OF HEARING IS GIVEN TO YOU. IF YOU WISH TO CONTEST THE ADOPTION, YOU MUST ALSO APPEAR AT THE HEARING. A FINAL DECREE OF ADOPTION MAY BE ENTERED IF YOU FAIL TO FILE AN OBJECTION TO THE ADOPTION PETITION OR APPEAR AT THE HEARING."

{¶ 4} The Notice was returned unclaimed, and a second "Notice of Hearing on Petition for Adoption" was issued on July 16, 2015, again setting a hearing for October 16, 2015 and containing the above language. On July 21, 2015, an "Affidavit that Ordinary Mail was not Returned" was filed by the clerk of the probate court.

{¶ 5} On July 30, 2015, correspondence dated July 24, 2015 was filed in the probate court that provides in part:

To whom it may concern;

My name is [B.W.], mother of [G.W.], date of birth * * *.

I have never, nor do I plan on signing my parental rights away to my son [G.W.] There is an open and on going (sic) custody case in Transylvania County, Brevard, North Carolina, case number * * * and this proceeding has

been ongoing since July 8th 2014; Transylvania County holds jurisdiction over this matter.

The apparent thing to do is dismiss this Petition of [G.W.] by [Stepmother] who has no blood ties to the minor child.

[Stepmother] has kept my son away from me, ([B.W.])

* * *

The correspondence appears to be signed by Mother.

{¶ 6} Also on July 30, 2015, correspondence was filed dated July 24, 2015 that appears to be signed by Grandmother and provides in part that Stepmother and Father have kept G.W. from Mother by moving several times without revealing the child's whereabouts. On August 4, 2015, correspondence from Grandmother enclosing documentation from the custody matter in North Carolina was filed that reflects that Grandmother initiated suit against Mother and Father on July 8, 2014.

{¶ 7} On August 6, 2015, the probate court issued an "Entry Setting Hearing" that provides: "It is hereby **ORDERED** that the Objection Hearing in the matter of the adoption of [G.W.] be scheduled for **September 30, 2015** at **9:30 o'clock** a.m. * * *." At the start of the hearing on that date, the following exchange occurred after the court instructed Mother, who appeared pro se, on the applicable procedure for the hearing :

THE COURT: Okay.  Mr. Sheets, you may proceed.

MR. SHEETS:   Your Honor, as a preliminary matter, I would actually like to make a motion, I believe that, I assume - - umm - - the Court unless there's some motion that I'm not aware of that the Court took a letter that was sent to the Court as an objection.   Is that correct?

THE COURT:   Yes, that's correct.

MR. SHEETS:   Then I move that be dismissed on the grounds not only on the actual filing itself but that it was provided not by the mother but by the grandmother who has no standing and is not a party to this case.

THE COURT:   I thought we had one from each?

MR. SHEETS:   No, the only one that I've seen was from the grandmother.   So that may be the case.

THE COURT: - - Umm - - the grandmother is [K.W.]?

MR. SHEETS:   Correct.

THE COURT:   I thought I saw one from - - but I thought I saw one from [Mother] as well, but maybe I didn't.   Did you send one?

[Mother]:   Yes, ma'am.

THE COURT:   Maybe you didn't get a copy?

MR. SHEETS:   Obviously, I didn't.

THE COURT:   So, yes, I saw the one from her.

* * *

MR SHEETS:   We just didn't get a copy of that.

* * *

MR. SHEETS:   I thought this was a little strange.   This explains that if you, the Court has a letter from the natural mother then we understand.

THE COURT:   Right.   Okay.   And a lot of, you know, custody papers and things of that nature.

MR. SHEETS:   Okay.

THE COURT:   Is that Correct?

[Mother]:   Yes, ma'am.

* * *

THE COURT:   All right.   Pretty much dated on the same date that was sent by the grandmother and pretty much says the same thing but didn't talk about herself like her mother did.

MR. SHEEETS:   All right.   That's fine, your Honor. We just - - we just obviously didn't get a copy and if we can - -

THE COURT:   Would you like for us to take a brief recess so, that you may have a copy?

MR. SHEETS: * * * if we could do that, your Honor, yes.

{¶ 8} After a recess, the following exchange occurred in the course of Mother's testimony:

Q.   I'm going to hand you what we marked as Exhibit 3.   I just want you to take a look at that and verify that.   So, all of that information looks familiar to you?

A.    Yes, sir.

Q.   * * * And the letter that you have on the front of that, is that a document that you presented to the Court or your mother presented?

A.   My mother, actually.

Q.   Okay.

A.   I was in jail at the time.

* * *

Q.   * * * So, your mother sent that in for you because you were in jail, is that what you said?

A.   Yes, sir.

Q.   So did you sign that document or did your mother sign it for you?

A.   My mother signed it.

MR. SHEETS:   Your Honor, at this point once again, I will renew our objection to the alleged objection because it appears to me that mother herself did not present the objection to the Court.   That in fact her mother signed two letters, one by herself, one signed as her daughter objecting to this.   Again, grandmother has no standing to pursue.

THE COURT: * * * Grandmother sent her letter on July 24, let me, yeah, July 24, same date.   And I would have anticipated that you would have filed a motion to dismiss at that point. * * * since you did not, I am, I know that grandmother does not have standing, but in view of the fact, that apparently, [Mother] asked her mom to do that for her. (sic)

THE WITNESS:   Huh-uh.

THE COURT:   And she was in jail.   I'm going to proceed.   I can take your Motion, hold your motion in abeyance.

{¶ 9}   Mother testified that she opined in her letter that the court lacked jurisdiction over the adoption petition because of the pending custody proceeding in North Carolina, and because G.W. was born in North Carolina.   Mother testified that she has not lost her rights to her son.   She stated that from June 2014 until June 2015 she has not provided any financial support for G.W. and that she was not able to do so.   Mother stated that

she "spent 111 days total in jail this year. Before that I've never been in jail." She stated that she was arrested for the first time on January 28, 2015. Mother stated that she was not employed during the second half of 2014 because she "couldn't find work. I live in a small town. I had transportation issues. There's not really many jobs." Mother stated that she is physically able to work but that she was not able to do so from June 2014 to January 2015. Mother stated that she is currently employed. Mother stated that she did not provide financial support for G.W. during the relevant period because "I had no income."

{¶ 10} When asked if Grandmother, in seeking custody of G.W. in North Carolina, alleged in her complaint that Mother had not assumed parental obligations or financially supported G.W., Mother responded that "she did allege that. And yes, that's true." Mother testified, "I am not denying that fact. I had postpartum depression really bad. I tried to commit suicide in March of last year. * * * I was voluntarily committed. I was only allowed to see my son but two hours a day. * * *." Mother stated that she was arrested five times in the last year for probation violations, harboring a fugitive, possession of drug paraphernalia, and larceny. She stated that all of the criminal matters are resolved and that she is no longer on probation. Mother stated that from June 2014 to the present she has resided "some of the time" with her mother and "some of it I lived with my husband," but that she has lived with her husband since June 2015. Mother stated that she was in contact with Grandmother from June 2014 to June 2015.

{¶ 11} Stepmother testified that she is married to Father, and that Mother has failed to provide maintenance and support for G.W. for a year prior to the filing of the petition for adoption. Stepmother testified that G.W. has received nothing from Mother. When asked if Mother was aware of G.W.'s address, Stepmother responded that Mother

"knew what state and area we lived in." When asked if she attempted to "disguise" where she and Father lived, Stepmother stated, "We have not given out our personal address. We have never concealed the city or state." She stated that Mother had Father's phone number and that he received text messages from her. Stepmother stated that "we discovered that one of the numbers that we assumed it was her to be texting, was in fact, not her because she was in jail and whoever it was, continued to text us." Stepmother stated that she and Father advised Mother that she could contact them by means of Father's mother, and that Mother sent Father's mother a message on Facebook in May 2015.

{¶ 12} Stepmother stated that Mother has not seen G.W. for one year prior to the time she filed the petition for adoption. She stated there were "times that she wanted to meet and that was set up. Next, we made two attempts and another time when she didn't show and she would not follow through. She had an opportunity." When asked by the court to specify a time period, Mother responded "the first time I believe it was around his birthday. It would have been November of 2014 and the last time I believe it was around January of 2015." Stepmother testified that she and Father told Mother that "we would meet at a local area and that we would meet her. One time we arranged to meet at one of the local beaches when we were living in Florida. And we attempted to do that in November and she didn't appear and then in January actually, I believe when she did not show up." Stepmother identified as Exhibit 2 "a notebook that me and my husband put together. All of the communications from [Mother] and [Grandmother]." Stepmother testified that she wanted the court to proceed with the adoption due to Mother's failure to provide de minimis contact or provide maintenance and support for

G.W.

**{¶ 13}** The following exchange occurred:

THE COURT:   * * * Let me get this straight.   When did you move to Ohio?

THE WITNESS:   We moved to Ohio, we got here on February 26th of 2015.

THE COURT:   And before that you were living in Florida?

THE WITNESS:   Yes, ma'am, that's correct.

THE COURT:   And * * * the mom was living in North Carolina?

THE WITNESS:   Yes.

* * *

THE COURT: * * * But she didn't have your address in Ohio?

THE WITNESS:   That's correct.

THE COURT:   And she didn't have your phone number?

THE WITNESS:   That's correct.

THE COURT: * * * So, you're saying she had your address in Florida?

THE WITNESS:   Yes, ma'am.

**{¶ 14}**  The following exchange occurred on cross-examination by Mother:

Q.   You think I was aware of when you moved?

A.   I can't answer that for you.

Q.   Did you guys tell me that you moved to Ohio and your address?

A.   We were not going to try to contact you until - -

THE COURT:   The answer is yes or no?   Did you tell her?

THE WITNESS: No, ma'am. No ma'am.

{¶ 15} On re-direct examination, Stepmother identified the complaint in the custody matter and testified that she and Father have returned to North Carolina three times in the course of that litigation, after they moved to Ohio. She stated that Father has received correspondence from Grandmother in North Carolina to Ohio and that she is aware of their address.

{¶ 16} Father testified consistently with Stepmother that G.W. has not received any financial support from Mother. Father testified that in the year before the petition for adoption was filed, he believed that Mother was aware of where he resided and how to contact him. He testified that he provided his addresses in Florida and Ohio to the attorney representing him in the custody litigation, and that if Mother was in contact with Grandmother, she could have obtained the information. The following exchange occurred:

Q. Did you take any action to try to hide from [Mother], to try to keep [G.W.] from [Mother]?

A. No. There's been a few times when I said she could come and visit him.

* * *

A. Discussed a place to meet not exactly at my house but a place near.

Q. * * * And what happened on those times?

A. She never - - anything, never showed up any time, no.

Q. And you have not disguised your phone number, moved

repeatedly as a way to try to keep [Mother] from her son?

A. No. I've changed my number but it was not to keep her from her son.

Father stated that Stepmother is in the military and that Grandmother was able to locate him and serve him in Hurlburt Field in Florida in the custody matter.

{¶ 17} The following exchange occurred on cross-examination:

Q. How long ago did you change your number?

A. * * * it has been around March.

Q. When I tried to contact you several times, it was disconnected at that time. So, how can I contact you about my son, when I didn't have your number? How do I get in touch with you?

A. Through my mother.

In response to a question from the court, Father stated that he never went to court to obtain child support from Mother for G.W.

{¶ 18} Grandmother testified as follows regarding her knowledge of the whereabouts of Father and Stepmother:

The paperwork that we received from [Stepmother] and her attorney or [Father] and his attorney - - um - - all the addresses of where they lived were crossed out on the paperwork. So, there is no home address. We have no phone numbers for them. Tried to contact them on Facebook, there's no reply. We're blocked from Facebook. So, we have no means of communicating with [G.W.] to find out how he is.

{¶ 19} At the conclusion of the hearing, the court asked the parties to file Proposed

Findings of Fact and Conclusions of Law. On October 15, 2015, Mother and Grandmother each filed documents setting forth facts and conclusions of law, and Stepmother filed Petitioner's Findings of Fact and Conclusions of Law on October 16, 2015.

{¶ 20} In its Judgment Entry, the probate court noted the following procedural background:

* * *

On July 30, 2015, a letter was filed with the Court, objecting to the proposed adoption ("Objections"). The letter did not include a certificate of service indicating that it had been served upon Stepmother or her counsel. While the letter appeared to be written and signed by Mother, it was in fact written and signed by Mother's mother, [K.W.] ("Grandmother"). In the Objections, Grandmother, pretending to be Mother, asserted that she had not relinquished, and did not plan to relinquish, her parental rights to GW. She further asserted that there was a custody case pending in the District Court Division of the General Court of Justice of North Carolina in Transylvania County ("Custody Case"), divesting this Court of jurisdiction over the adoption. Finally, she asserted that Stepmother had prevented her from visiting GW by moving without providing a new address and changing phone numbers without providing a new number. That same day, another letter objecting to the adoption was filed with the Court. It was written and signed by Grandmother and set forth essentially the same factual assertions and arguments as those set forth in the Objections.

* * *

{¶ 21} The probate court next summarized the factual background herein as follows:

GW was born [in] November [of] 2013 to Mother and * * * [Father] in * * * North Carolina. After GW's birth, Mother suffered from postpartum depression and was hospitalized as a result. Due in part to Mother's condition and hospitalization and in part to her substance abuse issues, GW lived with Grandmother from his birth until June 2014. On June 20, 2014, Father was given physical custody of GW. In a series of Facebook messages, Father and Grandmother initially expressed willingness to cooperate with one another regarding Father's custody and Grandmother's visitation with GW. For instance, on June 21, 2014, Father wrote, "you can contact me anytime". Grandmother responded, "I'm happy for you [Father]. I know you will care for him." The next day, Grandmother asked, "Can I ask what did DSS [Department of Social Services] here tell you? Are you keeping him forever, do I get to come see him?" Father responded, "I admire that you took him in and cared for him. I have no problem with you seeing him."

Unfortunately, Father and Grandmother's messages grew more tense over time. On July 2, 2014, Father asked that Grandmother send any items for GW to his mother's address in Louisiana; he refused to provide his address in Florida, despite Grandmother's assurance that she would not give his address to Mother. On July 8, 2014, Grandmother filed

the Custody Case and on August 7, 2014, Father and Grandmother exchanged messages regarding the case and Grandmother's desire to bring GW to her home for a family event in September. On October 6 and November 14, 2014, Father and Mother exchanged text messages, in which Mother asked how GW was doing and expressed a similar desire to bring GW to her home for his birthday. Father agreed that Mother could visit with GW, but required that she do so in Florida.

Mother, who was unemployed between June and December, 2014, was unable to arrange for transportation from North Carolina to Florida. Consequently, she did not appear for her visit with GW. On December 2, 2014, Mother exchanged text messages with Father, in which she asked how GW was doing and how his birthday went. On January 18, 2015, Mother advised Father that she would be arriving the next day, asking when would be a good time to visit with GW. When Father did not immediately respond, Mother stated, "We're gonna have to come to an agreement for [GW's] sake[.] [I'm] his mom * * * and [I'm] not a bad mom". Father again agreed that Mother could visit with GW in Florida. Later that same day, Mother informed Father that she would not be able to visit until the following Friday. Two days later, on January 20, 2015, Father asked Mother to confirm that she was visiting on Friday and she did so. She also asked Father to tell GW that she loved him and to send a picture of GW to her. On January 23, 2015, Grandmother advised Father that it was snowing heavily and that she and Mother would arrive in Florida the next day.

Although the reason is somewhat unclear, neither Grandmother nor Mother did so.

On January 28, 2015, Mother was arrested and incarcerated; between that date and the hearing date, she was arrested four more times, spending a total of 111 days incarcerated. On February 19, 25, and 26, 2015, someone pretending to be Mother sent Father a series of text messages asking how GW was. On February 26, 2015, Father responded:

I know this isn't Mother because she is in jail. This phone will be disconnected soon and the only way she will contact me is through my mom. Whoever this is you have been caught. It is stuff like this that keeps you from know[ing] anything about [GW]. The only person who is allowed to ask about him is [Mother]. Have a good day.

That same day, Father, Stepmother, and GW moved to their current home in Dayton, Ohio, pursuant to military orders assigning Stepmother to Wright Patterson Air Force Base. Later, Father changed his phone number. Father did not provide his new address or phone number to Mother or Grandmother, leaving Father's attorney in the Custody case and Father's mother as the only means of contacting him.

As the foregoing facts suggest, Mother did not provide any contact with GW between June 12, 2014 and June 12, 2015. She did not contact him by telephone, video call, text message, social media message, email, or letter. Likewise, Mother did not provide any maintenance and support

for GW during this time period. She was not ordered to pay child support and did not make any child support payments. Nor did she provide cash or any other items for GW's maintenance and support.

**{¶ 22}** Regarding its jurisdiction, the probate court determined as follows:

It is well-settled that the probate court does not lose its exclusive jurisdiction over adoption proceedings simply because a domestic relations or juvenile court has continuing jurisdiction over proceedings involving the same child. *State ex rel. Hitchcock v. Cuyahoga Cty. Ct. of Common Pleas*, *Probate Div.*, 97 Ohio App.3d 600, 604-08, 647 N.E.2d 208 (8th Dist.1994). Nevertheless, the probate court may be required to postpone ruling on an adoption petition if there are proceedings pending that involve parentage. *In re G.T.B.,* 128 Ohio St.3d 502, 2011-Ohio-1789, 947 N.E.2d 166, ¶ 10 fn.2; *In re Adoption of Pushcar*, 110 Ohio St.3d 332, 2006-Ohio-4572, 853 N.E.2d 647, at the syllabus. Significantly, however, if the pending proceedings involve only custody or visitation, the probate court is not required to postpone ruling on the petition. *State ex rel. Ostrowski v. Park*, 5th Dist. Stark No. 2012 CA 00121, 2012-Ohio-4813, ¶ 5-7; *In re Adoption of Joshua Tai T.*, 6th Dist. Ottawa No. OT-07-055, 2008-Ohio-2733, ¶ 36-37.

At the hearing, Mother argued that the Court lacks jurisdiction to rule on the Petition, or in the alternative, that the Court should postpone doing so until the conclusion of the Custody Case. As discussed above, however, the Court has exclusive jurisdiction over the proposed adoption

and the Court is not divested of its jurisdiction simply because the North Carolina court has continuing jurisdiction over proceedings involving GW. Moreover, because the North Carolina court proceedings involve custody and visitation, rather than parentage, the Court is not required to postpose ruling on the Petition. Therefore, the Court rejects Mother's arguments and proceeds to rule upon the Petition.

{¶ 23} In a section entitled "Validity of Objections," the probate court next determined as follows:

Notice of a petition for adoption and the hearing on the petition must be served upon the child's natural parents, even if they are alleged to have failed to provide de minimis contact or maintenance and support for the child. R.C. 3107.11(A)(1),(2). The notice, which informs the natural parent that she must file any objection to the adoption within fourteen days, must be served in accordance with the Ohio Rules of Civil Procedure. R.C. 3107.11(B),(C). These rules generally provide that service may be made by certified mail to the natural parent's residence; if the certified mail is returned unclaimed, service may be made by ordinary mail. *See* Civ.R. 73(E)(3),(5). The general provisions do not apply, however, if the natural parent is incarcerated in Ohio, in which case certified mail must be sent to her at the correctional institution and signed for by a prison official. *See* Civ.R. 73(E)(7), 4.2(D); *In re A.G.*, 4th Dist. Athens No. 14CA28, 2014-Ohio-5014, ¶ 18.

At the hearing, Stepmother moved for an order striking the

Objections and finding that Mother's consent to the proposed adoption was not required due to her failure to timely file an objection. In support, Stepmother argued that, as a non-attorney, Grandmother did not have the authority to sign and file the Objections on Mother's behalf and that the Objections did not include a certificate of service.

While Stepmother's argument was correct, it overlooked arguable defects in service of notice of the Petition and hearing upon Mother. More specifically, it overlooked the fact that Mother was incarcerated in North Carolina when the notice was sent by certified and ordinary mail to her former residence. While Mother's appearance at the hearing waived any arguable defects in service, under the circumstances it would have been manifestly unjust to conclude that Mother's failure to file an objection within fourteen days of delivery of the notice to her former residence waived her ability to object to the adoption, rendering her consent to the adoption unnecessary. Consequently, the Court would have been required to provide Mother an opportunity to object, regardless of whether it had stricken the Objections. And, since Mother's objections were identical to those set forth in the Objections, striking the Objections would have had no impact on the Court's decision on the issue of whether Mother's consent to the adoption was required. Thus, the Court reiterates its denial of Stepmother's motion.

{¶ 24} Regarding Mother's alleged failure to provide more than de minimis contact, the probate court concluded as follows:

In this case, the evidence clearly and convincingly shows that Mother failed to provide more than de minimis contact with GW between June 12, 2014, and June 12, 2015. Thus, the only question is whether her failure was without justifiable cause. In answering this question, it must be noted that GW was less than two years old, and therefore unable to converse or read during the relevant time period. Accordingly, telephone calls, video calls, text messages, social media messages, email and letters would have been ineffective means of contact with GW. Non-written correspondence, such as cards and photographs, arguably would have been more effective means of contact. As discussed below, however, Mother did not have addresses to which to send such correspondence, as Father moved four times[1] during the relevant time period, refusing to provide the addresses to which he moved.

Given the foregoing, the only effective means of contact with GW available to Mother was physical contact. Between June and September 2014, Mother made no attempt to provide such contact. Between October 2014 and January 2015, however, Mother contacted Father by text message several times a month, asking how GW was and asking to visit with GW. At least three visits were scheduled to take place near Father's home in Florida. Because, however, Mother was unemployed and did not own a car, she was unable to travel from her home in North Carolina to

[1] Stepmother's affidavit provides that G.W. resided with her and Father in Hurlbert Field, Florida from March 2014 to March 2015, and in Dayton, Ohio from March 2015 to the present, and it lists other previous addresses.

Florida for any of these visits. On January 28, 2015, Mother was arrested and incarcerated. Shortly thereafter, Father moved from Florida to his current home in Dayton, Ohio, and changed his phone number. Father did not provide his new address or phone number to Mother or Grandmother, and he blocked them on Facebook. While Father claims that Mother was able to communicate with him through his attorney in the Custody Case or his mother, there is no evidence that Mother was able to do so.

As Mother is surely aware, contact between mother and child is important throughout the child's life, particularly during the child's formative years. GW was without any contact from Mother during one of the most formative years of his life. The Court does not condone this lack of contact; however, it cannot ignore the fact that Mother persistently attempted to provide contact using the means available to her. Unfortunately, Father's insistence that visits take place near his home, coupled with Mother's unemployment and lack of transportation, prevented her from providing any contact between October 2014 and January 2015. And Mother's arrests and incarcerations, coupled with Father's refusal to provide his new address and phone number, prevented her from providing any contact between February 2015 and June 2015. Based on the foregoing, the Court finds that Mother has presented evidence of justifiable cause for her failure to provide more than de minimis contact with GW and that Stepmother has failed to show by clear and convincing evidence that Mother's failure was without such cause.

{¶ 25}   Regarding B.W.'s alleged failure to provide maintenance and support for G.W., the probate court determined as follows:

* * *

Despite the fact that Mother was not ordered to pay child support for GW, she had a legal duty to provide for his maintenance and support under both Ohio and North Carolina law.   *See* R.C. 3103.03(A), 3103.031; N.C. Gen Stat. 49-2.   The evidence clearly and convincingly shows that Mother failed to make any child support payments or to provide any cash or other items for GW's maintenance and support between June 12, 2014 and June 12, 2015.   Thus, the only question is whether Mother's failure was for justifiable cause.   In answering this question, it must be emphasized that financial ability to provide for the support of a child is "a key factor" in determining whether justifiable cause exists and that there is a "critical distinction" between parents who are willing but unable to provide support and those who are unwilling but able to do so. * * *

Between June 2014 and January 2015, Mother was unable to find work and was living either with her mother or her husband.   Between January 28, 2015 and the hearing date, Mother was arrested five times and incarcerated for a total of 111 days.   The foregoing evidence supports a finding that Mother was financially unable to provide for the maintenance and support of GW. Significantly, there is no contradictory evidence.   For instance, there is no evidence that Mother received any government benefits, any support other than shelter and food from her mother or her

husband, or even any illicit income from her alleged criminal activity. Therefore, the court finds that Mother presented evidence of justifiable cause for her failure to provide maintenance and support for GW and that Stepmother failed to show by clear and convincing evidence that Mother's failure was without justifiable cause.

{¶ 26}  Stepmother asserts three assignments of error herein.   Her first assigned error is as follows:

APPELLEEE'S OBJECTION TO THE ADOPTION WAS NOT PROPERLY FILED DUE TO A VIOLATION OF O.R.C. 4507.01 (sic) AND SHOULD HAVE BEEN DISMISSED.

{¶ 27} R.C. 4705.01 provides:

No person shall be permitted to practice as an attorney and counselor at law, or to commence, conduct, or defend any action or proceeding in which the person is not a party concerned, either by using or subscribing the person's own name, or the name of another person, unless the person has been admitted to the bar by order of the supreme court in compliance with its prescribed and published rules.

{¶ 28} According to Stepmother, Grandmother "was practicing law on behalf of her daughter when she drafted, signed and filed the letter objecting to the adoption.  The next question is what should be done with the purported filing."  Stepmother asserts that in *Ward v. Ludwig*, 149 Ohio App.3d 687, 2002-Ohio-5948, 778 N.E.2d 650 (4th Dist.), "the Court found that an attorney from another country who was not licensed to practice in Ohio, and who was not admitted pro hac vice, could not properly file an answer in [a]

domestic relations case. The court in *Ward* vacated the divorce decree, in part, because of the violation of R.C. 4507.01." (Sic). Stepmother asserts that her oral motion should have been granted and the adoption should have proceeded.

{¶ 29} In *Ward*, the Appellant therein, Astrid Ludwig, a German citizen living in Germany at the time her husband filed a complaint for divorce in Ohio, contested improper service upon her based upon her husband's failure to comply with The Hague Service Convention[2]. *Id.*, ¶1. Darren, Astrid's husband, served her in Germany by registered mail with a copy of the complaint, and the return receipt showed that Astrid received the complaint. *Id.*, ¶ 2. No one appeared on her behalf, but "a German lawyer did send purported pleadings on her behalf, even though he was not admitted to the practice of law in Ohio and was not admitted pro hac vice." *Id.*, ¶ 2. Astrid filed a motion to vacate the divorce decree that her husband obtained upon the entry of a default judgment against her, and the trial court overruled the motion. *Id.*, ¶ 3. On appeal, the Court determined that the divorce decree was null and void since, pursuant to the The Hague Service Convention, Darren "had to send the complaint and related papers to a central authority that would serve Astrid only if the papers were translated into German," and he failed to do so. *Id.*, ¶ 13. While the Court noted that the German lawyer "was not allowed to make an appearance on Astrid's behalf," pursuant to R.C. 4705.01, it concluded that Astrid's

---

[2] "The Hague Service Convention is a multilateral international treaty, directed to the manner of service of process abroad. * * * 'By virtue of the Supremacy Clause, U.S. Const., Art. VI, the Convention pre-empts inconsistent methods of service prescribed by state law in all cases to which it applies.' *Volkswagenwerk Aktiengesellschaft v. Schlunk,* 486 U.S. 694, 699 (1988)." *In re D.C.,* 9th Dist. Summit No. 23484, 2007-Ohio-2344, ¶ 22.

"actual notice of the complaint * * * served by registered mail to Astrid is insufficient" to accomplish proper service of process pursuant to the Convention. *Id.*, ¶ 15. We conclude that Stepmother's reliance upon *Ward* is misplaced; the divorce decree was declared null and void due to Darren's failure to properly perfect service of process. (Similarly, Stepmother failed to properly serve Mother with her petition for adoption, as the probate court determined, by failing to send it to the institution where Mother was incarcerated.)

{¶ 30} We further conclude that Stepmother's reliance upon R.C. 4705.01 is misplaced. As this Court has previously noted:

> * * * Implementation of the prohibition against the unauthorized practice of law is covered by Gov.Bar R. VII, which establishes a Board of Commissioners on the Unauthorized Practice of Law ("board") and further details certain procedures for investigation and prosecution of proceedings arising from complaints about the unauthorized practice of law. Each bar association in the state is allowed to establish a committee on the unauthorized practice of law, and both these committees and Disciplinary Counsel are required to investigate * * *. If warranted by the investigation, a formal complaint is filed with the board, which * * * sends its findings and recommendations to the Ohio Supreme Court. * * * [T]he Supreme Court can issue whatever orders it deems proper * * *.

> Subsection 4 of Gov.Bar R. 7 indicates that the procedure outlined above is the exclusive avenue for complaints * * * .

*Miami Valley Hospital v. Combs*, 119 Ohio App.3d 346, 352, 695 N.E.2d 308 (2d Dist. 1997).

**{¶ 31}** As this Court further noted:

The above analysis conducted by the Montgomery Court of Appeals remains persuasive in light of the recent enactment of R.C. 4705.07. Pursuant to subsection (B)(2), "the determination whether a person has committed the unauthorized practice of law in violation of division (A)(3) is solely within the purview of the Ohio Supreme Court."

(Citation omitted). *Crawford v. FirstMerit Mtge. Corp.*, 8th Dist. Cuyahoga No. 89193, 2007-Ohio-6074, ¶ 24.

**{¶ 32}** Finally, any error in failing to "dismiss" Mother's objections was rendered moot or harmless since the evidence adduced at the hearing, as discussed below, shows that Mother's consent to the adoption was required. For the foregoing reasons, Stepmother's first assignment of error is overruled.

**{¶ 33}** We will consider Stepmother's second and third assignments of error together. They are as follows:

THE COURT'S FINDING THAT APPELLEE HAD JUSTIFIABLE CAUSE FOR HER FAILURE TO PROVIDE SUPPORT FOR THE MINOR CHILD IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

And,

THE COURT'S FINDING THAT APPELLEE HAD JUSTIFIABLE CAUSE FOR HER FAILURE TO HAVE CONTACT WITH THE MINOR CHILD IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

**{¶ 34}** Regarding Mother's failure to provide support, Stepmother argues that the "evidence showed that [Mother] was able to work and was not incapacitated. At the same

time, she had outside resources, such as her mother, who could provide her housing and assist her while she was incarcerated, and could afford legal representation in her fight against [Father] in the actions in North Carolina." Regarding Mother's failure to have contact with G.W., Stepmother asserts that both she and Father "noted that [Grandmother] knew their address as there had been service of process on them while stationed at Hurlburt Air Force Base in Florida, that [Mother] contacted them by phone and by text, that she could contact [Father's] mother (and in fact had done so recently on Facebook), and that on three occasions had set up visits" with G.W. and failed to appear. Stepmother directs our attention to *In re R.L.H.,* 2d Dist. Montgomery No. 25734, 2013-Ohio-3462.

**{¶ 35}** We initially note that " '[a] parent has a fundamental right to care for and have custody of his or her child.' *In re K. C.*, 2d Dist. Montgomery No. 22243, 2008–Ohio–2593, ¶ 10. Those rights are terminated when a child is adopted." *In re Adoption of E.E.R.K.*, 2d Dist. Miami No. 2013 CA 35, 2014-Ohio-1276, ¶ 16. " 'Any exception to the requirement of parental consent [to adoption] must be strictly construed so as to protect the right of natural parents to raise and nurture their children.' *In re Schoeppner*, 46 Ohio St.2d 21, 24, 345 N.E.2d 608 (1976)." *E.E.R.K.,* ¶ 17.

**{¶ 36}** R.C. 3107.07 provides as follows:

Consent to adoption is not required of any of the following:

(A) A parent of a minor, when it is alleged in the adoption petition and the court, after proper service of notice and hearing, finds by clear and convincing evidence that the parent has failed without justifiable cause to provide more than de minimis contact with the minor or to provide for the

maintenance and support of the minor as required by law or judicial decree for a period of at least one year immediately preceding either the filing of the adoption petition or the placement of the minor in the home of the petitioner.

* * *

{¶ 37} As this Court has previously noted:

Probate courts undertake a two-step analysis when applying R.C. 3107.07(A). The first step involves deciding a factual question or questions: whether the parent had willfully failed to provide for the support and maintenance of a minor child or had failed to have more than de minimis contact with the child. Probate courts have broad discretion over these factual determinations, which will not be disturbed absent an abuse of discretion. *In re Adoption of J.R.H.*, 2d Dist. Clark No. 2013–CA–29, 2013–Ohio–3385, ¶ 25–28, citing *In re Adoption of M.B.*, 131 Ohio St.3d 186, 2012–Ohio–236, 963 N.E.2d 142, ¶ 21–23; *In re R.L.H.*, 2d Dist. Montgomery No. 25734, 2013–Ohio–3462, ¶ 12. If a probate court finds a failure to support or contact the child, the court's second step is to determine whether justifiable cause for the failure has been proven by clear and convincing evidence.[3] *In re J.R.H.* at ¶ 27. The question of whether

---

[3] "* * * The burden of clear and convincing evidence 'is that measure or degree of proof which is more than a mere "preponderance of the evidence," but not to the extent of such certainty as is required "beyond a reasonable doubt" in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.' *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus." *In re R.L.H.* , ¶ 10.

justifiable cause for such a failure has been proven in a particular case is a determination for the probate court and will not be disturbed on appeal unless such determination is against the manifest weight of the evidence. *Id.*, quoting *In re Adoption of Masa*, 23 Ohio St.3d 163, 492 N.E.2d 140 (1986), paragraph two of the syllabus.

*In re Adoption of S.M.H.*, 2d Dist. Greene No. 2013 CA 59, 2014-Ohio-45, ¶ 4.

**{¶ 38}** As this Court has further previously noted in *In re R.L.H.*:

* * * "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of fact." *In re B.A.H.,* [2d Dist. Greene No. 2012-CA-44,] 2012-Ohio-4441, at ¶ 21. " 'In determining whether a judgment is against the manifest weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice" that there must be a reversal of the judgment and an order for a new trial.' " *Id. * * *.

*Id.*, ¶ 23.

**{¶ 39}** Finally, as this Court noted in *In re R.L.H.*:

"Because cases such as these may involve the termination of fundamental parental rights, the party petitioning for adoption has the burden of proving, by clear and convincing evidence, that the parent failed to [have more than de minimis contact] with the child during the requisite one-year period and that there was no justifiable cause for the failure of

[contact]." (Citations omitted.) *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 368, 481 N.E.2d 613 (1985). "Once the petitioner has established this failure, the burden of going forward shifts to the parent to show some facially justifiable cause for the failure. * * * The burden of proof, however, remains with the petitioner." *In re A.N.B.*, 12th Dist. Preble No. CA2012–04–006, 2012–Ohio–3880, ¶ 10, citing *In re Adoption of Bovett*, 33 Ohio St.3d 102, 104, 515 N.E.2d 919 (1987).

*Id.*, ¶ 9.

**{¶ 40}** It is not disputed that Mother failed to provide more than de minimis contact with, and maintenance and support for, G.W. We further conclude that Stepmother failed to prove by clear and convincing evidence that Mother's lack of support and contact was without justifiable cause, and that the decision by the probate court that Mother's consent for the adoption was accordingly required and not obtained is supported by the manifest weight of the evidence.

**{¶ 41}** Regarding Mother's failure to provide support for G.W., we note that in *In re Adoption of Masa,* 23 Ohio St.3d 163, 492 N.E.2d 140 (1986), the Ohio Supreme Court found significant "the factual difference between a parent who is unwilling but able to support and a parent who is willing to support but unable to do so." *Id.* at 166. Accordingly, the Supreme Court determined that "ability to pay is a key factor in determining whether there is justifiable cause for failure to support a child," as the probate court noted. *Id.* at 167. We agree with the probate court that there was no evidence before it that Mother was financially able to provide support for G.W. Mother testified that she was unable to find work during the relevant period, and that she spent 111 days

in jail between January 2015 and the date of the hearing. There was no evidence, as the probate court noted, that Mother received any government benefits or received any support other than shelter from Grandmother or Mother's husband, or any income from any other source. Accordingly, having reviewed the entire record, we agree with the trial court's determination that Mother presented evidence of justifiable cause for her failure to provide support for G.W., and that Stepmother did not show by clear and convincing evidence that Mother's failure was without justifiable cause. In other words, the probate court's determination that justifiable cause has been proven for Mother's failure to provide support and maintenance for G.W. is not against the manifest weight of the evidence. Stepmother's second assigned error is accordingly overruled.

{¶ 42} Regarding Stepmother's assertion that Mother lacked justifiable cause for her failure to contact G.W., we note that "[t]ypically, a parent has justifiable cause for non-communication if the adopting spouse has created substantial impediments to that communication." *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 367, 481 N.E.2d 613 (1985). In *In re R.L.H.,* this Court noted the following facts:

Mother argued below that justifiable cause existed because she unsuccessfully and repeatedly had attempted to establish contact with R.L.H. during the one-year period through Father and through R.L.H.'s maternal and paternal grandmothers. In addition, she argued that Father significantly had interfered with any contact or communication by twice moving and not providing her with his address and phone number. Finally, she cited stress from her physical abuse by [her former husband,] K.Q. and the stress of being a single working mother caring for an infant child,

apparently from her relationship with K.Q., as facially justifiable cause for her lack of contact with R.L.H.

*Id.*, ¶ 17.

**{¶ 43}** The trial court found "the testimony about Mother and others trying to establish contact with R.L.H. on her behalf 'not credible.' " *Id.*, ¶ 18. The trial court further found Mother's argument regarding stress from the physical abuse she suffered and from caring for another child to be " 'facially justifiable cause for her failure to contact R.L.H.,' " but the court concluded that such a justification was " 'illusory' " since "no evidence was presented that showed that such stress * * * precluded [Mother] from contacting R.L.H. by perhaps less stressful means, such as telephone, letter, or card." *Id.*, ¶ 18-19. Regarding Mother's assertion that Father moved and did not provide an address, the court also concluded that such justification was " 'facially justifiable' " but " 'illusory.' " *Id.* It was significant to the trial court that Father drove R.L.H. to every supervised scheduled visitation at Erma's House, that Mother cancelled several visitations, and that upon receipt of correspondence from Erma's House that her case would be closed in the absence of a response, Mother failed to respond. *Id.*, ¶ 19. The trial court noted that while Father did relocate and change his number without notifying Mother, Mother's practice was to initiate contact with Father through R.L.H.'s paternal grandmother. *Id.* It was significant to the trial court that the "evidence showed, however, that [Mother] did not contact [the paternal grandmother] during the relevant time period," and that "although [Mother] likely could have obtained [Father's] contact information with minimum effort, she made no effort to do so." *Id.* On appeal, this Court determined that the "manifest weight of the evidence supports the trial court's finding that Mother's 'facially justifiable'

reasons for not contacting R.L.H. were illusory or not the real reason." *Id.*, ¶ 21.

{¶ 44} We conclude that Stepmother's reliance upon *In re R.L.H.* is misplaced for several reasons.    First, the trial court therein expressly found R.L.H.'s mother's testimony not credible, and there is no such finding herein by the probate court.    We note that R.L.H. was born in May 2008, and the hearing on the adoption petition occurred in March, 2013, when R.L.H. was almost five years old.    *Id.*, ¶ 3, 5.    G.W. was born in November 2013, and the hearing herein occurred in September 2015.    Unlike R.L.H., who could presumably speak on the phone in the year preceding the filing of the petition, as the probate court noted, G.W. was unable to converse during the relevant time period.    While there was no evidence that R.L.H.'s mother attempted to contact his father about visitation, Exhibit 2 herein, as the probate court accurately summarized and noted, reflects that Mother attempted to contact Father several times in order to visit G.W.    For example, on October 6, 2014, Father responded to a text from Mother that G.W. was "good growing . . . Doing better then (sic) ever."    Mother responded on the same date, "He did all those things since he came from my womb [Father] and you have no idea how good he had it here too.    I'm not gonna be kept from him * * *".    On November 14, 2014, Mother texted, " How's [G.W.]?    His birthday is in five days I have to see him and I would never keep him from you you need to stop tryin (sic) to keep him from me!"    On that same date, after Father responded that G.W. "is great!! Just growing," Mother responded, "I bet I miss him so much I'm dying inside.    I need to see him we need to be grown ups and come to a custody agreement without lawyers like we planned * * *."

{¶ 45} Mother attempted to arrange to visit G.W. in January 2015, texting, "When's a good time for me to come see [G.W.]?"    When Father responded, "Tomorrow

come to Fl," Mother asked, "Where in florida?   Need address."  Father responded, "Destin Fl I'll meet you at the beach it's 2 blocks from house." Mother then texted, "I'm sure the beach is big what part." In the course of the exchange, Mother indicated, "I want to see my baby," "I really wanna see [G.W.] so bad it hurts," "I want to see my son," and "Okay tell [G.W.] I love him and please send me a picture please."

{¶ 46} Regarding the text message that Father testified that he received from someone other than Mother asking about G.W.'s well-being, to which Father responded in part, "I know this isn't [Mother] because she is in jail," Exhibit 2 reflects that the exchange occurred in February 2015, and that Father received the following response: "I am a friend of hers she ask (sic) me to find out for her sorry I didn't mean to cause a problem."

{¶ 47}  Stepmother testified that she and Father "have not given out our personal address."   While she testified that Mother could and did, in May 2015, contact them by means of G.W.'s paternal grandmother on Facebook, there is no evidence to support that assertion.   Stepmother acknowledged that her family moved to Ohio in February 2015 and that they did not provide Mother with their address or phone number. It is unclear in *In re R.L.H.* what the distance was between R.L.H.'s parents after his father relocated, but it is clear herein that the distance between North Carolina and Florida and then Ohio was an obstacle for Mother, who lacked transportation.   Furthermore, Father testified that he changed his phone number six months before the hearing without providing the new number to Mother.

{¶ 48} Having reviewed the entire record, we conclude that the weight of the evidence supports the trial court's finding that Mother presented evidence of justifiable

cause for her failure to provide more than de minimis contact with G.W. Accordingly, Stepmother's third assignment of error is overruled.

{¶ 49} Having overruled all of Mother's assignments of error, the judgment of the trial court is affirmed.

. . . . . . . . . .

FAIN, J. and WELBAUM, J., concur.

Copies mailed to:


Michael A. Sheets
B.S./B.W.
Hon. Alice O. McCollum