[Cite as *In re P.L.H.*, 2016-Ohio-8453.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

| | | |
|---|---|---|
| IN THE MATTER OF: | : | |
| THE ADOPTION OF P.L.H. | | CASE NO. CA2016-09-185 |
| | : | |
| | | O P I N I O N |
| | : | 12/28/2016 |
| | : | |

APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
PROBATE DIVISION
Case No. PA15-11-0152

The Farrish Law Firm, Michaela M. Stagnaro, 810 Sycamore Street, 16th Floor, Cincinnati, Ohio 45202, for appellant-respondent

Voorhees & Levy, LLC, Michael R. Voorhees, 11159 Kenwood Road, Cincinnati, Ohio 45242, for appellees-petitioners

**S. POWELL, P.J.**

{¶ 1} Respondent-appellant, the putative father of P.L.H. ("Father"), appeals from the decision of the Butler County Court of Common Pleas, Probate Division, finding his consent to petitioners-appellees' petition to adopt P.L.H. was not necessary. For the reasons outlined below, we affirm.[1]

{¶ 2} The child at issue, P.L.H., was born on November 3, 2015. Approximately two

---

1. Pursuant to Loc.R. 6(A), we hereby sua sponte remove this case from the accelerated calendar for purposes of issuing this opinion.

months prior to his birth, on September 4, 2015, Father registered as P.L.H.'s putative father. It is undisputed that P.L.H.'s biological mother ("Mother") and Father were never married.

{¶ 3} On November 6, 2015, three days after P.L.H. was born, appellees filed a petition to adopt the child. Mother consented to the adoption and P.L.H. was subsequently placed in the temporary custody of appellees as his prospective adoptive parents. After receiving notice of appellees' petition, Father filed a timely objection with the probate court indicating he did not consent to the adoption. It is undisputed that Father did not have any in-person contact with Mother during her pregnancy, nor has Father had any contact with P.L.H. following the child's birth and placement with appellees.

{¶ 4} On April 13, 2016, the probate court held a hearing to determine whether Father's consent to appellees' petition to adopt P.L.H. was necessary. At this hearing, Mother and Father both testified. Following this hearing, on August 12, 2016, the probate court issued a written decision finding "[appellees] have proven by clear and convincing evidence that [Father] willfully abandoned [Mother] during her pregnancy and up to the time of the minor's placement in the home of the [appellees]." As a result, the probate court determined that "the consent of [Father] will not be required for this adoption to go forward."

{¶ 5} Father now appeals from the probate court's decision, raising the following single assignment of error for review:

{¶ 6} THE TRIAL COURT ERRED BY FINDING THE PUTATIVE FATHER'S CONSENT WAS NOT NECESSARY THEREBY ALLOWING PETITIONERS TO ADOPT THE MINOR CHILD.

{¶ 7} In his single assignment of error, Father argues the probate court erred by finding his consent to appellees' petition to adopt P.L.H. was not necessary. We disagree.

{¶ 8} Pursuant to R.C. 3107.06, certain persons and entities are required to consent to an adoption of a minor child. These persons include the minor's mother, father, and any

putative father of the child. R.C. 3107.06(A), (B), and (C). However, in accordance with R.C. 3107.07, there are several exceptions to the consent requirement. *In re T.L.S.*, 12th Dist. Fayette No. CA2012-02-004, 2012-Ohio-3129, ¶ 8. As relevant here, this includes when the "putative father has willfully abandoned the mother of the minor during her pregnancy and up to the time of her surrender of the minor, or the minor's placement in the home of the petitioner, whichever occurs first." R.C. 3107.07(B)(2)(c). Although R.C. 3107.07 does not define the term "willfully," the term "willful" as used in this context has been defined as "'proceeding from a conscious motion of the will; voluntary. Intending the result which actually comes to pass; designed; intentional; not accidental or involuntary.'" *In re B.A.H.*, 2d Dist. Greene No. 2012-CA-44, 2012-Ohio-4441, ¶ 22, quoting Black's Law Dictionary (Fifth Ed.1983).

{¶ 9} The burden is on the petitioner(s) to demonstrate by clear and convincing evidence that the putative father willfully abandoned the mother during her pregnancy. *In re Adoption of Suvak*, 3d Dist. Allen No. 1-03-51, 2004-Ohio-536, ¶ 7. Thus, whether a putative father willfully abandoned the mother "is a question of fact for the probate court and the court's determination will not be disturbed on appeal unless it is against the manifest weight of the evidence." *In re Adoption of Baby Doe*, 12th Dist. Butler No. CA92-03-056, 1993 WL 44223, *2 (Feb. 22, 1993). As we have previously observed in adoption proceedings:

> In determining whether a judgment is against the manifest weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the "trier of fact 'clearly lost its way and created such a manifest miscarriage of justice that there must be a reversal of the judgment and an order for a new trial." *In re Adoption of E.E.R.K.*, 2d Dist. Miami No. 2013 CA35, 2014-Ohio-1276, ¶ 18, citing *Stegall v. Crossman*, 2d Dist. Montgomery No. 20306, 2004-Ohio-4691, ¶ 29.

*In re L.C.W.*, 12th Dist. Butler No. CA2014-08-169, 2015-Ohio-61, ¶ 14, *appeal not allowed*

*sub nom. In re Adoption of L.C.W.*, 142 Ohio St.3d 1412, 2015-Ohio-1099. The weight to be given the evidence and the credibility of the witnesses are primarily for the trier of fact. *In re K.M.*, 5th Dist. Stark No. 2012CA00194, 2012-Ohio-6266, ¶ 13.

{¶ 10} Prior to addressing the facts of this case, we note that the probate court went to great lengths to establish a timeframe for when it can be said a father has willfully "abandoned" the mother. However, the statute itself defines the applicable timeframe. Again, R.C. 3107.07(B)(2)(c) specifically states that a putative father's consent is not necessary when the "putative father has willfully abandoned the mother of the minor *during her pregnancy and up to the time of her surrender of the minor, or the minor's placement in the home of the petitioner, whichever occurs first.*" (Emphasis added.) In turn, the applicable timeframe for willful abandonment would be, at a minimum, from the time the putative father learns of mother's pregnancy until the mother either surrenders the child, or the child is placed in the home of his or her perspective adoptive parent(s), whichever occurs first. Therefore, unlike other statutes dealing with abandoned children, specifically R.C. 2151.011(C), the facts of the case coupled with the language found in R.C. 3107.07(B)(2)(c) provide the applicable timeframe for when it can be said a father has willfully "abandoned" the mother during her pregnancy.

{¶ 11} Turning now to the facts of this case, at the hearing, both Mother and Father testified that P.L.H. was conceived sometime between February 14 and February 18, 2015 when Mother went to visit Father at his home in Louisiana. As noted above, Mother and Father were never married. Rather, at the time of conception, Mother and Father had known each other for several years after becoming friends while attending the same university in Ohio. Mother testified the lone sexual encounter with Father was nonconsensual, whereas Father denied those allegations. Regardless, a few weeks after visiting Father, Mother discovered that she was pregnant with Father's child.

{¶ 12} Almost immediately after learning she was pregnant, on March 5, 2015, Mother called Father and informed him of the news. When asked about this call, Mother testified that it lasted only five to ten minutes, during which time Father asked her to have an abortion. Father denied asking Mother to have an abortion. Instead, Father testified that he merely asked Mother if having an abortion was something she had considered. Mother testified that she had not considered having an abortion and would never consider having an abortion.

{¶ 13} Rather than considering having an abortion, Mother testified she informed Father that she was looking into placing the child up for adoption with appellees, a couple who lived in Tennessee who she had learned were looking to adopt. Mother testified she asked Father if he would support that decision, to which Father told her that he would. As Mother testified, "[s]o I asked him if he would support me and he said yes." Mother then testified:

> So I got off the phone and he texted me a little bit asking about [appellees] and I answered all his questions to the best of my ability. He expressed that he wanted to be able to have contact with the child and I said absolutely. That I would make that a priority that it would be an open adoption so that he could have contact with [P.L.H.]. And he said okay. And then that was it.

{¶ 14} When asked if Father had any additional contact with Mother over the next several months, Mother testified that they texted "occasionally," but that Father then "stopped talking with me completely." As Mother testified, "it was several months that I didn't hear from him." Although exchanging some text messages with Mother in March, April, and May of 2015, the record indicates Father did not call Mother or have any other contact with Mother for a period of nearly three months from June 8, 2015 until September 1, 2015. During this time, Mother was between four and six months pregnant.

{¶ 15} The next contact Mother had with Father was when she texted Father on September 2, 2015 in order to get his address so that appellees' attorney could send Father

the necessary paperwork to obtain his consent to the adoption. To this, Father provided Mother with his address but stated that he "won't sign anything" until he spoke with his mother. Mother thereafter called Father. According to the text message records submitted as evidence, Mother's call to Father likely occurred on September 3, 2015. Similar to Mother's first call to Father informing him that she was pregnant, Mother testified that this second call also lasted only a few minutes. As Mother testified regarding this call:

> I said that I needed his address to send the consent papers to and he said that he had told his mother about my pregnancy and that she wanted him to get a paternity test done. And I said I didn't know how to do that. Still don't know how to do that. And so I was like, are you not okay with this anymore? And he said that he wasn't and I was shocked. I hadn't heard from him in months and I didn't, I was caught [off] guard and I didn't know what to do. And so I said that I would have to ask my attorney * * * and so I gave him her number and then I called her and told her what happened and I said I really didn't know what to do and I was really scared.

{¶ 16} Following this call, Mother testified that she exchanged maybe one or two text messages with Father, but that she otherwise did not hear from Father again. (The text message records indicate these text messages were sent on September 9, October 10, and October 15, 2015, respectively.) Instead, on September 28, 2015, Father's attorney sent a letter to Mother's attorney that stated:

> Please find enclosed the putative father registry completed by [Father]. Also, this correspondence shall serve as the formal request for [Father] to receive sole custody of the child at birth and his formal objection to any adoption proceeding. In the event that [Mother] continues to have no desire to have parental rights to the child, [Father] will accept full responsibility for raising the child and [Mother] may relinquish her rights. In the events that she desires to receive information about the child over the years, [Father] is agreeable to working out those arrangements, similar to what would be an open adoption.
>
> [Father] is able to assist the birth mother with her medical expenses associated with the pregnancy, and necessary costs for her care. [Father] certainly does not want the birth mother to believe she has been abandoned during her pregnancy, and we

are willing to insure all appropriate bills are cared for as needed.

{¶ 17} Despite receiving this letter, when asked if she had ever actually received any financial support from Father during any period of her pregnancy, Mother testified that she received "no support. No financial. No emotional. No physical. Nothing." Mother also testified that Father gave her "no support throughout the entire pregnancy. He never called me. He never asked when I was due. * * * He supports us in no way shape or form and I could never trust my son with someone like that. He didn't care that whole time. He didn't do anything for us[.]"

{¶ 18} Father denied Mother's claims and instead testified that he "supported her a hundred percent" and "did the best he could," but that his efforts to support Mother were thwarted because Mother was not interested in his support and "did not give me anything." Yet, the record indicates that Father's efforts to "support" Mother were via sporadic text messages and by sending a check for $100 to appellees with a notation stating "child support" nearly a month after P.L.H. was born. The record also indicates Father purchased various baby items and furniture that he set up in his home in Louisiana where he lived with his mother and grandmother. According to the receipts admitted into evidence, many of these items were also purchased after P.L.H. was born. Finally, although he did have some contact with Mother via text message and two phone calls, as noted above, it is undisputed that Father did not have any in-person contact with Mother during her pregnancy, nor has Father had any contact with P.L.H. following the child's birth and placement with appellees.

{¶ 19} After a thorough review of the record, we cannot say the probate court's decision finding Father willfully abandoned Mother during her pregnancy and up to when P.L.H.'s was placed in appellees' care was against the manifest weight of the evidence. This decision does not come lightly for it is well-established that "[a] parent has a fundamental right to care for and have custody of his or her child." *In re Adoption of E.E.R.K.*, 2d Dist.

Miami No. 2013 CA 35, 2014-Ohio-1276, ¶ 16. However, as noted above, we do not find that the probate court clearly lost its way and created such a manifest miscarriage of justice, that there must be a reversal of the judgment and a new trial ordered. *In re L.C.W.*, 2015-Ohio-61 at ¶ 14.

{¶ 20} In this case, just as the probate court found, Father never provided Mother with any support during her pregnancy, financial or otherwise, nor did Father even attempt to provide such support to Mother after learning she was pregnant with his child. Rather, as the record indicates, upon learning Mother was pregnant, Father never called Mother to inquire about the pregnancy or even when the child was due. Father instead opted to contact Mother via text message. However, even this contact was, at best, sporadic (Father had text message contact with Mother during a total of 16 days between March 6 and October 15, 2015) and only occasionally touched on the fact that Mother was pregnant at all. For example, during one text message exchange Father told Mother that he had reorganized his bedroom and game room to make it "a theatre experience now," whereas another text message exchange discussed his workouts for football, and that the woman who did their pedicures when Mother visited him in February now works at his gym.

{¶ 21} Moreover, just as the trial court found, the record reveals Father did not have any contact with Mother for a period of nearly three months beginning on June 8, 2015 until September 1, 2015, a period of time when Mother was between four to six months pregnant. Regardless, when Father actually did have contact with Mother, the record indicates Father was generally willing to consent to the adoption and sign the necessary paperwork, a willingness that completely changed after Father spoke with his own mother of September 2 or September 3, 2015, shortly before Father registered as a putative father on September 4, 2015.

{¶ 22} The record further indicates Father's only attempt to provide any financial

support was a check for $100 he sent to appellees, not Mother, as "child support." However, even this was done over a month after P.L.H. was born. As Mother testified, and as the record demonstrates, Father provided her with "no support. No financial. No emotional. No physical. Nothing." Although Father claimed otherwise, asserting that you are "willing" and "able" to support the mother of your child through a letter from your attorney is a far cry from actually tendering that financial and emotional support. This is particularly true here considering the letter at issue was sent to Mother's attorney a mere 36 days before P.L.H. was born. Therefore, while we acknowledge Father's concerns, we simply cannot say the probate court's decision finding Father willfully abandoned Mother during her pregnancy was against the manifest weight of the evidence. *See, e.g., In re K.M.*, 2012-Ohio-6266 at ¶ 14 (trial court's decision finding father willfully abandoned mother during her pregnancy was not against the manifest weight of the evidence where father did not offer or provide any financial support to mother, nor any other assistance, despite being able to contact mother via cell phone and/or social media during her pregnancy).

{¶ 23} In so holding, although not raised within a separate assignment of error, we note that Father claims there is an issue as to whether the probate court had the authority to proceed "on the merits" because there was a "parenting issue" pending in the Butler County Court of Common Pleas, Juvenile Division. However, based on Father's own memorandum filed with the probate court on February 23, 2016, the juvenile court dismissed these matters upon finding the probate court "had exclusive jurisdiction over the pending action[.]" It is undisputed that Father did not appeal from the juvenile court's decision. Rather, as Father specifically acknowledged within his memorandum, "the issue of jurisdiction is solely in probate court and there is no option to stay these proceedings further." Father also specifically stated that he would "defer" to the probate court "regarding the decision to proceed on both the issue of consent and on the best interest standard." We have reviewed

the record properly before this court and conclude that there is nothing in the record to indicate the probate court lacked jurisdiction to proceed with the adoption in this case. Accordingly, having found no merit to any of Father's arguments raised herein, Father's single assignment of error lacks merit and is overruled.

{¶ 24} Judgment affirmed.

RINGLAND, J., concurs.

HENDRICKSON, J., dissents.

**HENDRICKSON, J., dissenting.**

{¶ 25} I respectfully dissent from the majority's opinion as I find the trial court's determination that Father willfully abandoned Mother during her pregnancy and up to the time of the child's placement with the petitioners was against the manifest weight of the evidence. In the present case, petitioners-appellees failed to establish by clear and convincing evidence that Father willfully abandoned Mother during the relevant statutory time period.

{¶ 26} Over the years, the Ohio Supreme Court has consistently recognized the importance of a natural parent's right to his or her children. In *In re Adoption of G.V.*, 126 Ohio St.3d 249, 2010-Ohio-3349, ¶ 5-6, and *In re Adoption of P.A.C.*, 126 Ohio St.3d 236, 2010-Ohio-3351, ¶ 5-6, the supreme court stated the following:

> "[T]he right of a natural parent to the care and custody of his children is one of the most precious and fundamental in law." *In re Adoption of Masa* (1986), 23 Ohio St.3d 163, 164, * * * citing *Santosky v. Kramer* (1982), 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599. *Santosky* has been characterized as "requiring a clear and convincing evidence standard for termination of parental rights because the parent's interest is fundamental but the State has no legitimate interest in termination unless the parent is unfit, and finding that the State's interest in finding the best home for the child does not arise until the parent has been found unfit." *Cruzan v. Director, Missouri Dept. of Health* (1990),

497 U.S. 261, 319, 110 S.Ct. 2841, 111 L.Ed.2d 224 (Brennan, J., dissenting).

"Few consequences of judicial action are so grave as the severance of natural family ties." *Santosky*, 455 U.S. at 787, 102 S.Ct. 1388, 71 L.Ed.2d 599 (Rehnquist, J., dissenting). Because adoption terminates fundamental rights of the natural parents, "we have held that '* * * [a]ny exception to the requirement of parental consent [to adoption] must be strictly construed so as to protect the right of natural parents to raise and nurture their children.'" *In re Adoption of Masa,* 23 Ohio St.3d at 165, * * * quoting *In re Schoeppner* (1976), 46 Ohio St.2d 21, 24 * * *[.] With "a family association so undeniably important * * * at stake," [courts should] approach [a] case * * * "mindful of the gravity" of the circumstances and the long-term impact on all the concerned parties. *M.L.B. v. S.L.J.* (1996), 519 U.S. 102, 117, 117 S.Ct. 555, 136 L.Ed.2d 473.

{¶ 27} There is no dispute that Father is a putative father, as defined by R.C. 3107.01(H). "A putative father is simply a man who might be a child's biological father but who has no legal relationship with the child through marriage to the mother or the establishment of legal paternity." *In re Adoption of H.N.R.*, 145 Ohio St.3d 144, 2015-Ohio-5476, ¶ 16, citing R.C. 3107.01(H). At the time a man engages in sexual intercourse, he is considered to be on notice of the potential biological and ensuing legal consequences of that intercourse. *Id.* at ¶ 17, citing R.C. 3107.061. From that point forward, the man can register as a putative father by filling out a short form on a webpage maintained by the Ohio Department of Job and Family Services ("ODJFS") or by mailing the same information to ODJFS. *Id.*, citing Ohio Adm.Code 5101:2-48-02(C).

{¶ 28} The Ohio Supreme Court has noted that "[i]t is important to recognize the competing policy considerations that the legislature attempts to balance through its enactment of the adoption statutes related to putative fathers." *In re Adoption of Zschach*, 75 Ohio St.3d 648, 650 (1996). Both the Ohio Supreme Court and the United States Supreme Court have recognized a putative father's right to a parental relationship with his offspring. *Id.* at 650-651; *In re Adoption of Greer*, 70 Ohio St.3d 293, 298 (1994); *Lehr v. Robertson*, 463

U.S. 248, 261-265, 103 S.Ct. 2985 (1983). The rationale behind protecting a putative father's right to have a parental relationship with his offspring is as follows:

> The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the child's future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development.

*Lehr* at 262; *Greer* at 298, fn. 2.

{¶ 29} In construing the adoption statutes, the Ohio Supreme Court has recognized that "[a]ny exception to the requirement of parental consent must be strictly construed so as to protect the right of natural parents to raise and nurture their children." *In re Adoption of Schoeppner*, 46 Ohio St.2d 21, 24 (1976); *Greer*, 70 Ohio St.3d at 300. Further, although the adoption statutes "are in derogation of common law and therefore must be strictly construed * * * strict construction does not require that [courts] interpret statutes in such a manner that would mandate an unjust or unreasonable result." *Zschach*, 75 Ohio St.3d at 655. *See also In re Adoption of A.N.*, 3d Dist. Union No. 14-12-27, 2013-Ohio-3871, ¶ 27.

{¶ 30} In the case at bar, the critical inquiry is whether Father "willfully abandoned" Mother as contemplated by R.C. 3107.07(B)(2)(c), such that his consent to the adoption of the child is not required. The consent statute provides in relevant part:

> Consent to adoption is not required of any of the following:
>
> * * *
>
> (B) The putative father of a minor if either of the following applies:
>
> (1) The putative father fails to register as the minor's putative father with the putative father registry established under section 3107.062 of the Revised Code not later than fifteen days after the minor's birth;

(2) The court finds, after proper service of notice and hearing, that any of the following are the case:

(a) The putative father is not the father of the minor;

(b) The putative father has willfully abandoned or failed to care for and support the minor;

(c) *The putative father has willfully abandoned the mother of the minor during her pregnancy and up to the time of her surrender of the minor, or the minor's placement in the home of the petitioner, whichever occurs first.*

(Emphasis added.)

**{¶ 31}** As the majority noted, the term "willfully abandoned" is not defined by statute. The majority relied on the dictionary definition of "willful" in construing R.C. 3107.07(B)(2)(c). However, as the trial court recognized in its decision, the definition of the term "abandoned" is also important.

> Webster's Dictionary commonly defines "abandon" as: to give up to the control or influence of another person or agent; to give up with the intent of never again claiming a right or interest in; to withdraw from often in the face of danger or encroachment; to withdraw protection, support, or help from; to cease from maintaining, practicing or using; to cease intending or attempting to perform; to desert; to forsake.

> Black's Law Dictionary (6 Ed.1990) 2, defines "abandon" as: "[t]o desert, surrender, forsake or cede. To relinquish or give up with intent of never again resuming one's right or interest. To give up or to cease to use. To give up absolutely; to forsake entirely; to renounce utterly; to relinquish all connection with or concern in; to desert. It includes the intention and also external act by which it is carried into effect."

*In re Adoption of Klonowski*, 87 Ohio App.3d 352, 356 (1993).

**{¶ 32}** While the trial court examined the dictionary definitions of "willful" and "abandon," the court failed to observe that the legislature made a distinction between a putative father's actions under subdivision (B)(2)(c) of R.C. 3107.07, as it relates to the mother, and those under subdivision (B)(2)(b), as they relate to the child. Under subdivision

- 13 -

(B)(2)(b), a putative father's consent is not necessary if he has "willfully abandoned *or failed to care for and support the minor.*" (Emphasis added.) Use of the word "or" within this subdivision indicates that willful abandonment is a separate and distinct concept from failing to care for and support the child. Subdivision (B)(2)(c) of the statute does not contain the same language; the legislature did not include the phrase "or failed to care for or support" the mother during her pregnancy. Care and support, therefore, are not a component of "willful abandonment." If the legislature intended for the "care and support" of the mother to be considered, it would have used the same language in both subdivisions. Thus, any reference to Father caring for and/or supporting Mother during the pregnancy has no relevance in determining whether the putative father willfully abandoned Mother. The focus of the court's inquiry must remain on whether Father deserted, forsook, or relinquished all connection with Mother. *See Black's Law Dictionary* 2 (6th Ed.1990).

{¶ 33} In applying the definition of "abandoned," the record does not establish by clear and convincing evidence that Father deserted Mother, forsook her, or relinquished all connection with her during her pregnancy. As the trial court noted in its decision, Mother and Father have "known each other for a number of years, having become friends while both were attending the same university in Ohio." After Father graduated, he moved to Louisiana and started living with his mother and grandmother. At the time the child was conceived, Mother was briefly visiting Father in Louisiana. After a short visit, Mother returned to her "nanny" position and externship in Florida before heading back to Ohio in August 2015, to complete her studies. Father, however, remained in Louisiana where he was living and employed during Mother's pregnancy. Father never attempted to avoid Mother.

{¶ 34} After learning of Mother's pregnancy following a phone call in March 2015, Father did not forsake Mother or relinquish all contact with her. He never told Mother he did not want anything to do with her or the child or to never contact him again. Rather, to the

contrary, Father told Mother he wanted to support her and even invited Mother to come and see him when he was nearby, but she declined. Father also maintained open communication with Mother. He had the same phone number throughout Mother's pregnancy and exchanged test messages with Mother about her life and about the baby. At one point, Father exchanged "I love you's" with Mother and asked about the health of the baby and whether Mother knew the sex of the baby. Father also always responded to Mother's messages and phone calls. The evidence, therefore, demonstrated that although sporadic, Father always kept the door of communication open and available to Mother. Though the trial court noted there had not been any contact between Father and Mother for a three-month period of the pregnancy, the record reveals that Father kept in contact by sending a letter, via his attorney, that he had completed the putative father registry and did not want Mother to believe she had been abandoned during her pregnancy.

{¶ 35} The evidence also demonstrated that it was Mother who created the adoption plan without consulting with Father, and it was Mother who was insistent about seeking adoption for the child, regardless of Father's thoughts on the matter.[2] Mother selected appellees as the child's adoptive parents without any involvement from Father. Mother stopped communicating with Father after he informed her he would not consent to the adoption and he intended to seek custody of the child. Instead of reaching out to Father, Mother looked to appellees for her daily emotional and financial support. Mother did not discuss the financial costs of the pregnancy with Father or present him with any bills, despite Father's willingness to assist with such costs. Mother failed to advise Father of when the

---

2. As the trial court noted, Mother had a "firm conviction" about her decision to place the child up for adoption, whereas Father had "mixed" emotions about Mother's decision to pursue adoption. Father's mixed emotions were communicated with Mother throughout the pregnancy, leaving the trial court to conclude that "at times [Father's] messages seemed to be supportive, at other times were not wholly supportive of the adoption process going forward, and near the end of the pregnancy, [Father], at least through his counsel, expressed opposition to the plan of adoption."

baby was due, and she immediately surrendered P.L.H. to appellees after his birth, effectively cutting-off Father's ability to establish paternity prior to appellees receiving the child.

{¶ 36} Therefore, having construed the phrase "willfully abandoned" in a manner consistent with its ordinary and natural meaning, I find that appellees did not establish by clear and convincing evidence that Father willfully abandoned Mother during her pregnancy, as contemplated by R.C. 3107.07(B)(2)(c). If courts are going to give any real meaning to the protection of a natural parent's right to the care and custody of his child, rather than mere lip service, then, in the present case, Father's parental rights need to be honored. Father accepted responsibility and grasped the opportunity to be a parent to P.L.H. He did not abandon Mother during her pregnancy, but rather expressed his desire to have custody of P.L.H. and his willingness to pay for expenses related to the child. Father should be permitted to enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to P.L.H.'s development.

{¶ 37} Accordingly, as the probate court's determination that Father's consent to the adoption was unnecessary is against the manifest weight of the evidence, I would sustain Father's assignment of error and reverse the judgment of the probate court.