[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *In re Adoption of P.L.H.,* Slip Opinion No. 2017-Ohio-5824.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2017-OHIO-5824

IN RE ADOPTION OF P.L.H.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *In re Adoption of P.L.H.,* Slip Opinion No. 2017-Ohio-5824.]

*Adoption—R.C. 3107.07(B)(2)(c)—Putative father's consent to adoption is not necessary if he has "willfully abandoned" birth mother—Putative father's failure to care for and support birth mother is not relevant basis for proceeding with adoption without putative father's consent—Inquiry regarding willful abandonment focuses on whether clear and convincing evidence establishes that putative father voluntarily or intentionally deserted, forsook, or abdicated all responsibility for birth mother.*

(No. 2017-0173—Submitted June 21, 2017—Decided July 18, 2017.)

APPEAL from the Court of Appeals for Butler County, No. CA2016-09-185, 2016-Ohio-8453.

_____

FRENCH, J.

{¶ 1}  Appellant, C.W., the putative father of minor child P.L.H., appeals the judgment of the Twelfth District Court of Appeals, which concluded that his consent to the child's adoption by appellees, K.H. and P.H., was not necessary under R.C. 3107.07(B)(2)(c) because he "willfully abandoned" the birth mother

during her pregnancy and up to the time of the child's placement with the appellees. For the reasons below, we reverse the judgment of the Twelfth District and remand the matter to the probate court to vacate its adoption decree and to dismiss the appellees' adoption petition.

**FACTS AND PROCEDURAL HISTORY**

*Events leading up to the child's birth*

{¶ 2} C.W. and the birth mother, S.C., met each other and became friends while both were undergraduates at an Ohio university. C.W. graduated in December 2013 and moved back to his native Louisiana in the spring of 2014, but he maintained contact with S.C. In the fall of 2014, while still a student, S.C. started a year-long internship in Orlando and lived with a family in Florida as its nanny.

{¶ 3} In February 2015, S.C. visited C.W. in Louisiana during the Mardi Gras holiday and stayed with him at his grandmother's house. The child was conceived sometime during that visit between February 14 and 18, 2015. After returning to Florida, S.C. discovered that she was pregnant. She called C.W. on March 5, 2015, to inform him that she was pregnant and that she wanted to place the child for adoption with the appellees, who live in Tennessee and are acquaintances of the family S.C. lived with in Florida.

{¶ 4} The parties do not dispute that C.W. and S.C. did not see each other during her pregnancy. After the March 5, 2015 telephone call, they spoke to each other one other time by telephone in early September 2015. During the pregnancy, they exchanged text messages on March 6, March 13, April 3, April 5, April 7, April 21, April 22, April 27, May 2, June 8, September 1, September 2, September 3, September 9, October 10, and October 15, 2015.

{¶ 5} Although S.C. testified that she believed that C.W. initially supported her decision to place the child for adoption, C.W.'s text messages reflect his ambivalence about her decision. On March 6, the day after the phone

2

conversation in which S.C. told him about the pregnancy, C.W. wrote, "I don't know [if I'll] want it to be adopted or not. I won't for a couple months." C.W. told S.C. that he was raised without a father and that he "made a vow" never to let his own child grow up without a father. C.W. also stated that the decision is "kinda up to both of us" and that he would find it "hard" to "act like it never happened." S.C. insisted that her "mind [was] made up," even if C.W. wanted to keep the child, and that she wanted the child to "have two parents and a stable life."

{¶ 6} During the early months of the pregnancy, communication between C.W. and S.C. remained friendly and even affectionate, as reflected in the following exchange of text messages on April 3, 2015:

C.W.: Is the baby healthy? You know the sex?

S.C.: Yes! And no I won't find out for a couple more months! I'll let you know!

C.W.: Ok cool love you.

S.C.: Love you too! Thanks for checking on me! I'm in South Carolina this weekend visiting my family for Easter!

* * *

C.W.: So how are we?

S.C.: We are good!

C.W.: Okay I have to ask cause I don't see you and the whole baby thing. And maybe you do or don't know how I feel about you but just making sure.

S.C.: I know you are a good guy! This doesn't change anything. We made a mistake, but it's handled. I'm not worried about it. I will always [be] here for you!

C.W.: Good. As I am for you.

S.C.: I know :).

{¶ 7} From June 8 to September 1, 2015, a period of almost three months, C.W. and S.C. did not communicate with each other. On September 2, 2015, S.C. sent a text message asking for C.W.'s address so that she could send him a consent form for the adoption. C.W. gave his address, but he stated that he would not sign anything until he talked to his mother. S.C. then called C.W., apparently the next day. She testified that she was "shocked" and caught off guard that C.W. was "not okay with" the adoption. S.C. told C.W. that he needed to contact her attorney and gave him the attorney's telephone number.

{¶ 8} After the early September phone call, C.W. texted S.C. three times: on September 9 to ask about the baby's sex, on October 10 to wish her a happy birthday, and on October 15 asking her to call him. Other than saying "thank you" to his birthday greeting, S.C. did not respond to these messages.

{¶ 9} By way of a letter dated September 28, 2015, C.W.'s attorney gave notice to S.C.'s attorney that C.W. sought sole custody of the child at birth and objected to any adoption proceedings. Enclosed with the letter was a copy of C.W.'s registration form for the Ohio Putative Father Registry, which had been completed on September 4, 2015. The letter also stated that C.W. "is able to assist the birth mother with her medical expenses associated with the pregnancy, and necessary costs for her care. [C.W.] certainly does not want the birth mother to believe she has been abandoned during her pregnancy, and we are willing to ensure all appropriate bills are cared for as needed."

### Birth of child and adoption proceedings in probate court

{¶ 10} P.L.H. was born on November 3, 2015, in Butler County, Ohio. The next day, S.C. filed an application in Butler County Probate Court to place P.L.H. with the appellees as prospective adoptive parents. On November 6, 2015,

the probate court approved S.C.'s application. On that same day, the appellees filed their petition for adoption and S.C. filed her consent to the adoption.

{¶ 11} C.W. did not know of the child's birth until he saw a photo of S.C. on Facebook showing that she was no longer pregnant. After seeing the photo, C.W. filed a complaint to establish paternity and a motion for temporary custody on December 3, 2015, in Butler County Juvenile Court.[1] On that same day, the probate court issued a notice to C.W. that it had scheduled a hearing on the appellees' adoption petition. C.W. filed a timely objection indicating that he did not consent to the adoption and that he sought to obtain sole custody of the child.

{¶ 12} On April 13, 2016, the probate court held a hearing, which included testimony from S.C., C.W., and the appellees, to determine whether C.W.'s consent was required for the adoption to proceed. The court later concluded that his consent was not required under R.C. 3107.07(B)(2)(c) because he "willfully abandoned [S.C.] during her pregnancy and up to the time of the minor's placement in the home of the Petitioners." The court found that C.W. had provided no financial support to S.C. during her pregnancy, even though he earned approximately $70,000 during 2015. The court also found that C.W.'s contact with S.C. during the entire period of her pregnancy and up to the child's placement was "sporadic," as reflected in the nearly three-month gap in communication from June 8 to September 1, 2015. And the court found that after September 1, C.W.'s contact with S.C. was de minimis.

{¶ 13} The probate court, however, rejected the remaining grounds upon which the appellees argued that C.W.'s consent was not required. The court concluded that the appellees did not prove by clear and convincing evidence that C.W. willfully abandoned or failed to care for and support the minor under R.C.

---

[1] To date, C.W. has not established paternity in the juvenile court under R.C. Chapter 3111. On February 23, 2016, C.W. gave notice to the probate court that the juvenile court had dismissed his paternity complaint for lack of jurisdiction because of the adoption case already pending in probate court and that he had not appealed that decision.

3107.07(B)(2)(b). The court pointed to C.W.'s attorney's letter of September 28 to the birth mother's attorney, which stated C.W.'s intention to raise the child, and to C.W's complaint to establish paternity and motion to obtain custody filed in juvenile court. The court also noted that C.W. had sent a letter to the appellees on November 9, 2015, stating that he would reimburse them for all pregnancy expenses, totaling approximately $8,500. The court additionally noted that around December 10, 2015, C.W. had sent the appellees a check for $100, designated as "child support" on the memo line, and that C.W. had purchased baby furniture, bedding, clothes, and diapers and had prepared his home in Louisiana for the child.

{¶ 14} After weighing the relative credibility of the witnesses, the probate court also found insufficient evidence that the child was conceived as a result of nonconsensual sexual relations instigated by C.W. The probate court concluded that R.C. 3107.07(F) did not provide a basis for proceeding without C.W.'s consent.

{¶ 15} The appellees also argued that requiring C.W.'s consent would violate S.C.'s constitutional right under the Due Process Clause of the Fourteenth Amendment to the United States Constitution to place her newborn for adoption. The court found it unnecessary to address this argument given its conclusion that C.W.'s consent was not required because he willfully abandoned the mother. Finally, the appellees argued that C.W.'s consent was not necessary because adoption would be in the best interest of the child. The court concluded that the best interest of the child is not a valid ground for finding that a putative father's consent is not required under R.C. 3107.07.

{¶ 16} After determining that C.W.'s consent was not required, the court made a separate determination under R.C. 3107.161 that adoption by the appellees would be in P.L.H.'s best interest. The court issued orders on September 7, 2016,

finding that C.W.'s consent was not required for the adoption to occur and granting the appellees' adoption petition.

*The appeal*

{¶ 17} C.W. appealed to the Twelfth District Court of Appeals, arguing that the probate court's determination that he willfully abandoned the birth mother was against the manifest weight of the evidence. The appellees did not file a cross-appeal of the probate court's findings that they failed to establish other grounds for the adoption to proceed without C.W.'s consent.

{¶ 18} The Twelfth District in a split decision affirmed the probate court's determination that C.W. willfully abandoned S.C. 12th Dist. Butler No. CA2016-09-185, 2016-Ohio-8453, ¶ 19. The majority concluded that C.W. "never provided [S.C.] with any support during her pregnancy, financial or otherwise." *Id*. at ¶ 20. The majority noted that C.W. did not call S.C. to inquire about her pregnancy and instead communicated only though "sporadic" text messages and then had no contact with S.C. for nearly three months from June to September 2015. *Id*. at ¶ 20, 21. While acknowledging that C.W. offered to assist with S.C.'s medical expenses in his September 28, 2015 letter, the majority concluded that the letter, sent "a mere 36 days" before the child's birth, was "a far cry from actually tendering that financial and emotional support." *Id.* at ¶ 22. The majority also noted that C.W. sent a $100 check to the appellees for "child support" and purchased baby items and furniture. *Id*. at ¶ 18, 22. These attempts to provide financial support, however, were directed to the child, not the mother, and then only after the child's birth. *Id*. at ¶ 22.

{¶ 19} The dissenting judge arrived at a different conclusion by pointing to the differences between R.C. 3107.07(B)(2)(b) and (c). Under R.C. 3107.07(B)(2)(b), a putative father's consent to adoption is not necessary if he "willfully abandoned *or failed to care for and support the minor*." (Emphasis added). By contrast, R.C. 3107.07(B)(2)(c), which pertains to willful

abandonment of the mother, does not contain the words "failed to care for and support." The dissenter therefore concluded that care or support for the mother "has no relevance in determining whether the putative father willfully abandoned" the mother. 2016-Ohio-8453, at ¶ 32 (Hendrickson, J., dissenting). Relying on the common meaning of the word "abandon," the dissenter concluded that the record does not establish by clear and convincing evidence that C.W. "deserted," "forsook" or "relinquished all connection with" S.C. during her pregnancy. *Id*. at ¶ 33. "[A]lthough sporadic, [C.W.] always kept the door of communication open and available" to S.C., and it was clear that S.C. had rejected any support from C.W. *Id*. at ¶ 34, 35.

## QUESTION PRESENTED

**{¶ 20}** We accepted C.W.'s appeal on the following proposition of law:

> Whether a putative father "willfully abandoned" a mother during her pregnancy, under R.C. 3107.07(B)(2)(c), does not include a requirement that the putative father failed to provide care and support to the mother.

## ANALYSIS

### *The motion to dismiss*

**{¶ 21}** We first address the appellees' motion to dismiss this appeal, in which they argue that C.W. has waived the argument he makes in his proposition of law. C.W. argued in the Twelfth District that the probate court's determination of willful abandonment was against the manifest weight of the evidence. He did not assert, however, the specific statutory argument addressed for the first time by the Twelfth District's dissenting judge—that care and support for the mother is not relevant in determining whether a putative father willfully abandoned the

8

mother under R.C. 3107.07(B)(2)(c). We nevertheless find that C.W. did not waive the argument he presents in his proposition of law.

{¶ 22} In order to resolve the ultimate question before us, whether C.W. "willfully abandoned" the birth mother, we must necessarily determine the meaning of that phrase and address whether R.C. 3107.07(B)(2)(c) permits consideration of the putative father's failure to care for and support the mother. "When an issue of law that was not argued below is implicit in another issue that was argued and is presented by an appeal, we may consider and resolve that implicit issue." *Belvedere Condominium Unit Owners' Assn. v. R.E. Roark Cos., Inc.*, 67 Ohio St.3d 274, 279, 617 N.E.2d 1075 (1993), *modified in part on other grounds, Dombroski v. WellPoint, Inc.*, 119 Ohio St.3d 506, 2008-Ohio-4827, 895 N.E.2d 538, syllabus. Stated another way, "if we must resolve a legal issue that was not raised below in order to reach a legal issue that was raised, we will do so." *Id*. We therefore deny the motion to dismiss and address the merits of C.W.'s appeal.

### *Meaning of "willfully abandoned" under R.C. 3107.07(B)(2)(c)*

{¶ 23} We begin with the premise that "the right of a natural parent to the care and custody of his children is one of the most precious and fundamental in law." *In re Adoption of Masa*, 23 Ohio St.3d 163, 165, 492 N.E.2d 140 (1986), citing *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). Because adoption terminates those fundamental rights, we must construe strictly any exception to the requirement of parental consent to adoption in order to protect the right of natural parents to raise and nurture their children. *In re Adoption of Schoeppner*, 46 Ohio St.2d 21, 24, 345 N.E.2d 608 (1976). And because the meaning of "willfully abandoned" involves a question of statutory construction, we review this issue de novo. *See Lang v. Dir., Dept. of Job & Family Servs.*, 134 Ohio St.3d 296, 2012-Ohio-5366, 982 N.E.2d 636, ¶ 12.

**{¶ 24}** R.C. 3107.07(B) states that the consent of a timely registered putative father is not necessary if the probate court finds either that the putative father "has willfully abandoned or failed to care for and support the minor," R.C. 3107.07(B)(2)(b), or "has willfully abandoned the mother of the minor during her pregnancy and up to the time of her surrender of the minor, or the minor's placement in the home of the petitioner, whichever occurs first," R.C. 3107.07(B)(2)(c).

**{¶ 25}** C.W. argues that R.C. 3107.07(B)(2)(c) does not make the putative father's failure to "care for and support" the mother during her pregnancy a relevant basis for proceeding with an adoption without the putative father's consent. We agree.

**{¶ 26}** The statute makes a clear distinction between a putative father's actions toward the minor child and his actions toward the birth mother. With respect to the minor, a putative father's consent is not necessary if he "willfully abandoned *or failed to care for and support the minor.*" (Emphasis added.) R.C. 3107.07(B)(2)(b). By contrast, R.C. 3107.07(B)(2)(c), which pertains to willful abandonment of the mother, does not contain the words "failed to care for and support." A probate court's determination under R.C. 3107.07(B)(2)(c) must focus solely on whether the putative father "willfully abandoned" the mother.

**{¶ 27}** Both the probate court and the court of appeals majority relied on C.W.'s lack of financial support for S.C. during her pregnancy as evidence that C.W. willfully abandoned her. And the concurring opinion argues that the putative father's lack of financial support should factor as part of the court's analysis in determining whether he willfully abandoned the mother. We cannot, however, add words to the statute. The express language in R.C. 3107.07(B)(2)(c) simply does not contain the words "failed to care for and support." A putative father's failure to care for and support *the minor child* provides a relevant basis under R.C. 3107.07(B)(2)(b) for determining that his

10

consent to the adoption is not required. R.C. 3107.07(B)(2)(c), however, does not make the failure to care for and support *the mother* a basis for proceeding with the adoption without the putative father's consent.

{¶ 28} The appellees and their amici curiae argue that a putative father should be required to demonstrate tangible commitment to the mother by providing financial, emotional or physical care and support. They raise a policy concern, however, more properly addressed by the General Assembly. Until and unless the legislature chooses to impose a greater burden on putative fathers, and in light of our obligation to strictly construe any exception to the requirement of parental consent before adoption, we must interpret the statute as written.

{¶ 29} To be clear, a putative father's care and support for the mother does not lose all relevance in adoption proceedings implicating R.C. 3107.07(B)(2)(c). If a putative father does provide care and support for the mother, our holding does not constrain a probate court from considering the father's conduct as a factor to refute the allegation that he willfully abandoned the mother. Financial support is one of many ways that a putative father could demonstrate involvement in the mother's life. R.C. 3107.07(B)(2)(c), however, does not make the father's *failure* to care for and support the mother a basis for determining that his consent is not required. The statute does not equate the failure to care for and support the mother with willful abandonment of the mother.

{¶ 30} Having determined what R.C. 3107.07(B)(2)(c) does not say, we now turn to the question of what "willfully abandoned" actually means. In the absence of a statutory definition, we look to the common usage of "willful" and "abandon" to determine their intended meanings. *See State ex rel. Data Trace Information Servs., L.L.C. v. Cuyahoga Cty. Fiscal Officer*, 131 Ohio St.3d 255, 2012-Ohio-753, 963 N.E.2d 1288, ¶ 49. The word "willful" is defined as "[v]oluntary and intentional, but not necessarily malicious." *Black's Law Dictionary* 1834 (10th Ed.2014). To "abandon" means "1. To leave (someone),

esp. when doing so amounts to an abdication of responsibility. 2. To relinquish or give up with the intention of never again reclaiming one's rights or interest in. 3. To desert or go away from permanently." *Id*. at 1; *see also Webster's Third New International Dictionary* 2 (2002) ("abandon" means "to forsake or desert esp. in spite of an allegiance, duty, or responsibility").

{¶ 31} Using these common definitions, we conclude that a probate court's finding of willful abandonment under R.C. 3107.07(B)(2)(c) should focus on whether the putative father voluntarily or intentionally deserted, forsook or abdicated all responsibility for the birth mother during her pregnancy and until the mother's surrender of the child or placement of the child in the prospective adoptive home, whichever occurs first.

### *Applying definition of "willfully abandoned" to evidence*

{¶ 32} We turn next to the question whether the evidence in the record— irrespective of C.W.'s failure to care for or support the birth mother—provides a basis for the probate court's determination that C.W.'s consent to the adoption is not necessary because he willfully abandoned her. We have stated that due process requires the party invoking an exception to the parental-consent requirement to " 'establish *each* of [its] allegations' " by clear and convincing evidence. (Emphasis sic.) *Masa*, 23 Ohio St.3d at 166, 492 N.E.2d 140, quoting *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 368, 481 N.E.2d 613 (1985); *accord Santosky*, 455 U.S. at 747-748, 102 S.Ct. 1388, 71 L.Ed.2d 599. The appellees therefore had the burden of establishing by clear and convincing evidence that C.W. abandoned the birth mother during her pregnancy and that the abandonment was willful. Whether willful abandonment has been proven by clear and convincing evidence is a determination for the probate court and will not be disturbed on appeal unless that determination is against the manifest weight of the evidence. *Masa* at 166.

{¶ 33} Ordinarily, upon a determination that the courts below applied the wrong legal standard, we would remand the matter to the probate court or the court of appeals to consider the evidence under the correct legal standard. Remand for that purpose is not necessary here, however, because the record contains no evidence, let alone clear and convincing evidence, to support a finding that C.W. voluntarily or intentionally deserted, forsook or abdicated all responsibility for S.C. during her pregnancy.

{¶ 34} In a letter dated September 28, 2015—more than a month before P.L.H.'s birth—C.W. stated that he did "not want the birth mother to believe she has been abandoned during her pregnancy" and offered "to assist the birth mother with her medical expenses associated with the pregnancy, and necessary costs for her care." They exchanged text messages from March 6 through June 8, 2015, and then from September 1 through October 15, 2015. In those messages, they discussed matters relating to S.C.'s pregnancy and C.W.'s ambivalence about placing the child for adoption. They also expressed care and affection for each other and exchanged "I love yous" and assurances that they would support each other. And as friends often do, C.W. communicated by text message to share with S.C. important aspects of his life, such as his career plans, as well as mundane details, such as how he had rearranged the furniture in his home. The record does not demonstrate that C.W. deserted S.C. Rather, he sought to maintain open communication with her. Indeed, even after their contentious early September 2015 phone call, C.W. texted S.C. three times. He texted on September 9 to ask about the baby's sex, on October 10 to wish her a happy birthday, and on October 15 asking her to call him. S.C. did not respond to these messages, aside from saying "thank you" to his birthday greeting.

{¶ 35} The record also contradicts S.C.'s contention that C.W. never inquired about the pregnancy. On April 3, 2015, C.W. initiated contact and asked, "Is the baby healthy? You know the sex?" S.C. responded that she would

not know for a couple of months but would let him know, to which C.W. responded, "Ok cool love you." S.C. then responded, "Love you too! Thanks for checking on me!" On September 9, 2015, C.W. again asked whether the baby would be a boy or a girl. S.C. never responded, even though she admits that she knew the baby's sex by then and had already told the appellees.

{¶ 36} The probate court and the court of appeals majority pointed to the nearly three-month gap in communication from June to September 2015 as evidence that C.W. abandoned S.C. R.C. 3107.07, however, does not mandate consistent or frequent contact with the mother. The fact that C.W. demonstrated continued involvement throughout her pregnancy is sufficient to refute the allegation that he "abandoned" her under the ordinary meaning of the word.

{¶ 37} Moreover, the record contains conflicting evidence as to who stopped communicating with whom. S.C. testified that C.W. "stopped talking" to her for several months prior to September 2015. C.W. testified that he and S.C. "talked day and night" before the pregnancy but that when S.C. realized that C.W. did not want the adoption to proceed, she "severed" communications and stopped responding to him. Given that S.C. stated her very clear intention to proceed with the adoption without C.W.'s input or involvement, the communication gap was just as likely the result of S.C. distancing herself from C.W. Indeed, it was C.W. who sent the last text message before that nearly three-month gap, on June 8, 2015: "Thinking of you. Enjoy your day." And it was C.W. who broke the nearly three-month silence by sending S.C. a text message on September 1, 2015. The record does not substantiate the conclusion that C.W. abandoned S.C. nor that any silence in communication between the two parties was willful and intentional on C.W.'s part.

{¶ 38} We conclude that the probate court's determination that C.W. willfully abandoned S.C. was both contrary to the express language in R.C. 3107.07(B)(2)(c) and against the manifest weight of the evidence. We therefore

14

reverse the Twelfth District's judgment and remand the matter to the probate court to vacate its adoption decree and, for the further reasons explained below, to dismiss the appellees' adoption petition.

### *No remaining grounds for adoption to proceed*
### *without putative father's consent*

**{¶ 39}** We also conclude that the appellees cannot assert any additional grounds for proceeding with their adoption petition without C.W.'s consent. The appellees argued below that requiring the consent of the putative father would violate S.C.'s constitutional right as a birth mother to place her newborn for adoption. The probate court construed this argument as an attack on the constitutional validity of R.C. 3107.07(B). But it declined to rule on the merits of the argument because of its finding that C.W.'s consent was not required.

**{¶ 40}** The appellees have reasserted their constitutional argument here. We decline, however, to address the merits of that argument because the appellees do not have standing to assert the constitutional rights of someone else. *See N. Canton v. Canton*, 114 Ohio St.3d 253, 2007-Ohio-4005, 871 N.E.2d 586, ¶ 1; *Util. Serv. Partners, Inc. v. Pub. Util. Comm.*, 124 Ohio St.3d 284, 2009-Ohio-6764, 921 N.E.2d 1038, ¶ 49 (" 'a litigant must assert its own rights, not the claims of third parties' "), quoting *N. Canton* at ¶ 14.

**{¶ 41}** The appellees asserted before the probate court three additional grounds for claiming that C.W.'s consent was not required. The court rejected those arguments, and the appellees did not file a cross-appeal of those findings. Because the appellees have not asserted any other bases for the adoption to proceed without C.W.'s consent, our ruling here conclusively resolves the appellees' adoption petition.

### CONCLUSION

**{¶ 42}** As a final matter, we acknowledge that all parties have the child's best interest at heart and that our decision is the end result of a process in which

we must choose between two imperfect and unsatisfying options. This appeal charges us with the unenviable task of reaching a result that either overrides the adoption plan of a diligent birth mother and separates P.L.H. from the only home he has ever known or that terminates permanently C.W.'s fundamental right to raise and nurture his child. In light of our responsibility to strictly construe any exception to the requirement of parental consent to adoption and based on the specific facts of this case, we reverse the judgment of the Twelfth District Court of Appeals and remand the matter to the probate court to vacate the adoption decree and to dismiss the appellees' adoption petition.

Judgment reversed

and cause remanded.

O'DONNELL, KENNEDY, O'NEILL, and FISCHER, JJ., concur.

DEWINE, J., concurs in judgment only, with an opinion joined by O'CONNOR, C.J.

————————————

**DEWINE, J., concurring in judgment only.**

**{¶ 43}** I concur with the majority's conclusion that the evidence does not support a finding that C.W. willfully abandoned P.L.H.'s birth mother, S.C., during her pregnancy. But I am compelled to write separately because I believe that the majority's analysis strays from the plain meaning of the phrase "willfully abandoned" and unnecessarily limits the evidence that a lower court may consider in determining whether a putative father has willfully abandoned an expectant mother.

**{¶ 44}** The statute at issue provides that a putative father's consent to adoption is not required if he "willfully abandoned the mother of the minor during her pregnancy and up to the time of her surrender of the minor, or the minor's placement in the home of the petitioner, whichever occurs first." R.C.

16

3107.07(B)(2)(c). The majority notes the dictionary definitions of the words that make up the phrase "willfully abandoned":

> The word "willful" is defined as "[v]oluntary and intentional, but not necessarily malicious." *Black's Law Dictionary* 1834 (10th Ed.2014). To "abandon" means "1. To leave (someone), esp. when doing so amounts to an abdication of responsibility. 2. To relinquish or give up with the intention of never again reclaiming one's rights or interest in. 3. To desert or go away from permanently." *Id.* at 1; *see also Webster's Third New International Dictionary* 2 (2002) ("abandon" means "to forsake or desert esp. in spite of an allegiance, duty, or responsibility").

Majority opinion at ¶ 30. The majority should have begun and stopped there. The record demonstrates that under these common definitions of the words, C.W. did not willfully abandon S.C. He did not abdicate all responsibility toward her. That is all that is needed to decide the case.

{¶ 45} The majority, however, goes beyond the ordinary meaning of "abandon" and provides additional guidance about what the phrase "willfully abandoned" means. In doing so, the majority unnecessarily limits a lower court's consideration of financial support. This limitation has little relation to the plain language of the statute.

{¶ 46} Rather than starting with the plain language of the statutory provision at issue, R.C. 3107.07(B)(2)(c), the majority chooses to begin its analysis by looking at another statutory provision, R.C. 3107.07(B)(2)(b). That statute provides another avenue for finding that a putative father's consent to adoption is not required—if he "willfully abandoned or failed to care for and support the minor." The majority postulates that because this statute includes the

words "failed to care for and support" in addition to "willfully abandoned" and R.C. 3107.07(B)(2)(c) does not, the probate court and the court of appeals erred when they considered C.W.'s lack of financial support in determining whether he had willfully abandoned S.C. In the majority's view, lack of financial support can *never* be relevant to the question whether a putative father willfully abandoned a pregnant mother.

{¶ 47} But that makes little sense. Under a plain reading of the term "willfully abandoned," the failure to provide financial support is something that may have relevance to the determination. Turn back to the definitions of abandon. The first definition emphasizes "abdication of responsibility"—no question failing to provide financial support could be relevant here. Next, "to relinquish or give up with the intention of never again reclaiming one's rights or interest in"—again, it is hard to see how the failure to provide financial support to the mother couldn't be relevant to a determination whether the father has voluntarily relinquished his rights. Third, "to desert or go away from permanently"—once again, it is pretty clear that lack of financial support is conceivably relevant to a determination whether the father has voluntarily deserted the mother. To acknowledge that the lack of financial support could be evidence of abandonment does not add words to the statute; to the contrary, it gives effect to the plain meaning of the statute's words.

{¶ 48} True, the failure to provide financial support by itself cannot be determinative in the analysis. None of the definitions regarding willful abandonment deals solely with the failure to provide financial support. That financial support cannot by itself be determinative is reinforced by the legislature's decision to make care and support a separate factor under R.C. 3107.07(B)(2)(b) but not under R.C. 3107.07(B)(2)(c). Thus, the lack of financial support is relevant under the statutory scheme only to the extent that it sheds light on the issue whether the father willfully abandoned the mother.

**{¶ 49}** This case is a good illustration of why the lack of financial support is not dispositive. C.W. may not have sent S.C. money during her pregnancy, but his other actions—his telephone calls and text messages—evince his intent not to abdicate his responsibility. Yet, in another set of circumstances, a putative father's failure to financially support a pregnant mother could be relevant. What of a millionaire putative father who ignores the pleas for help of an expectant mother who has no resources? Are the courts to ignore his failure to provide financial support? No doubt such a lack of support is probative of the millionaire's abdication of responsibility. The lack of support should not be the only factor considered in deciding whether the father willfully abandoned the mother, but it should be a part of the court's analysis.

**{¶ 50}** The majority opinion gets even more curious when it says that even though the failure to provide financial support *may not* be considered, the provision of financial support *may* be considered. That's certainly a headscratcher.

**{¶ 51}** On the one hand, the majority argues that lack of financial support cannot be considered as evidence of willful abandonment because the words "care for and support" don't appear in R.C. 3107.07(B)(2)(c). Yet, somehow, the absence of the words in the statute doesn't prevent the courts from considering the converse—a putative father's provision of financial support.

**{¶ 52}** What the majority apparently means is that while the father's failure to provide financial support can't be held against him, it can be used as a factor in his favor. But this makes little sense. After all, the question is about the construction of "willfully abandoned." Financial support either may have some relevance to the determination or it may not have relevance to the determination. If what we are doing is simply applying the plain meaning of "willfully abandoned," it is hard to see how financial support counts in the analysis but the lack of support doesn't count at all.

**{¶ 53}** Far from providing lower courts guidance to aid their determination whether willful abandonment has occurred, the majority opinion confuses matters more. I would keep it simple: the failure to provide financial support is not dispositive but may properly be considered part of the determination whether the father has "willfully abandoned" the mother under R.C. 3107.07(B)(2)(c).

**{¶ 54}** In determining whether willful abandonment has occurred, a probate court should look to the plain meaning of the phrase. Its focus should be on whether the father has voluntarily abdicated all responsibility toward the mother, whether he has voluntarily given up his rights, and whether he has voluntarily deserted the mother during her pregnancy. We should not unnecessarily limit the evidence that a probate court may consider in its inquiry. Financial support as well as phone conversations, letters, and text messages may—in an appropriate case—be proper considerations. But they are relevant only to the extent that they inform the question whether the father willfully abandoned the mother.

**{¶ 55}** I did not vote to accept the discretionary appeal in this case, because it seemed to be simply about the weight of the evidence rather than about an error of law. After reviewing the record and the parties' arguments, my opinion in that regard has not changed. The full court having chosen to accept the appeal—and having conducted my own independent review of the evidence—I am convinced that the probate court's decision was against the manifest weight of the evidence. Thus, I concur in the majority's judgment.

**{¶ 56}** But I concur only in its judgment, because in applying R.C. 3107.07(B)(2)(c), I feel constrained to stick to the plain and ordinary meaning of the phrase "willfully abandoned."

O'CONNOR, C.J., concurs in the foregoing opinion.

_____

Voorhees & Levy, L.L.C., and Michael R. Voorhees, for appellees.

The Farrish Law Firm and Michaela M. Stagnaro, for appellant.

Faruki, Ireland, Cox, Rhinehart & Dusing, P.L.L., and Ruth T. Kelly, urging affirmance for amicus curiae Ohio Adoption Law Roundtable.

Barbara T. Ginn, urging affirmance for amicus curiae S.C., birth mother.

Landis Terhune-Olaker, urging affirmance for amicus curiae Adoption Circle.

Mary Beck; and Susan Garner Eisenman, urging affirmance for amicus curiae American Academy of Adoption Attorneys.

_____